# TAB F

March 21, 2012

Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
United States Department of Labor
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C. 20210

**RE:  Wage and Hour Division – (RIN) 1235-AA05
Comments on Proposed Rulemaking Regarding Application of the FLSA to Domestic Service**

Dear Ms. Ziegler:

The National Private Duty Association (NPDA) is a trade association representing more than 1,400 companies with over 250,000 employees throughout the United States. NPDA member companies provide in-home, <u>non</u>-medical care to aging seniors and people with disabilities who cannot perform activities of daily living on their own, and choose to privately pay out of pocket for these services.

As President of the National Private Duty Association, I write to express our opposition to the Department of Labor's (DOL's) Wage and Hour Division (WHD) Notice of Proposed Rulemaking (NPRM) published December 27, 2011, in the *Federal Register* at 76 *Fed. Reg.* 81190-81245. If implemented, this rule change virtually eliminates almost four decades of rules governing the companion care exemptions from the Fair Labor Standards Act (FLSA). Following is a detailed explanation of our opposition.

*NPDA opposes proposed changes to FLSA companion care exemption*

There is no demonstrable need for regulatory alteration. Removing the exemption for third party employers does not comply with Congressional intent. The NPRM severely limits the exemption's use by households given the new restrictions it places on personal care. And, the proposed changes will have a profound, adverse impact on the individuals and families we care for as well as in-home care companies in the U.S. and the tens of thousands of people they employ.

Based on a national survey of over 1500 home care companies, a Navigant Economic Analysis and an analysis conducted by the International Franchise Association, NPDA believes these outcomes are likely consequences should this rule be enacted:

- In-home <u>non</u>-medical care providers will face increased cost, as they would be required to pay overtime. This will especially impact caregivers who provide periodic 24-hour support or live-in companion care[1]. This requirement, coupled with new burdensome reporting requirements, will force employers to limit caregivers' hours, creating the need for multiple

---

[1] "Live-in" companion care refers to service models where the caregiver resides in the home of the person they support.

- caregivers to work segmented shifts through the day, thus drastically harming the client's quality of care.

- As the costs of care rise, clients may be forced away from insured, bonded, licensed in-home care providers, opting instead for unskilled workers in the underground "grey market." These independent employees often come without background checks or home-care training and are uninsured; leaving families without recourse should a crisis arise.

- If in-home care becomes economically unfeasible for families, a greater number of those in need of care will be more likely to utilize public programs, such as Medicaid, leaving taxpayers responsible for the cost of caring for the needy.

- Ultimately, small business private duty home care employers, which are labor-intensive and low-margin operations, will be forced to change their business model in ways that do not benefit those they support or their home care staff.

Private pay home care is <u>non</u>-medical, in-home companion care. It is not "home <u>health</u> care" as referred to in the NPRM. This type of care is frequently what is needed to allow a fragile, aging senior or a person with disabilities to remain in his or her own home. Private duty home care allows the client to avoid institutionalization, something that is very important to our seniors and persons with disabilities.

In-home private pay care is considerably more cost-effective to society as a whole than institutional care that is usually paid for through Medicaid or some other government program. Furthermore, affordability is a primary consideration of the individuals and families we serve who private pay. Accordingly, striking the wrong balance means individuals who cannot afford private duty care may turn to institutional options which, while less expensive for them, are more costly for society.

***Disqualification of third-party employers for companion care exemption could lower the quality of available in-home care providers***

Under current law, in-home care providers who are employed by third-party companies are exempt from the standard wage requirements. This law, which has been in place for nearly 40 years, recognizes that the nature of work done by home care providers and in particular round-the-clock in-home care providers differs drastically from that of a 9-to-5 factory worker.

WHD proposes to make companion care exemptions to the FLSA unavailable for caregivers who are employed by a third party entity and severely modifies the definition of personal care service for caregivers employed by the client or their family.

Should this rule be put into place, to keep cost affordable, third party employers will need to limit caregiver hours to 40 in a given week for those who require periodic support. That will mean less continuity of care as a result of more caregivers coming into the home. The private pay cost for those who require incidental 24-hour support or live-in companion care will be prohibitive, except for those who have the wealth to afford it.

Subsequently, families and clients could be inclined to turn to independent caregivers or an underground market. Third-party in-home private duty caregivers are licensed, bonded, and given extensive education about safety practices. But independent caregivers often come without

background checks or training in home-care and are uninsured, leaving families without recourse should a crisis arise.

As a result, recipients of care could be at greater risk for elder abuse, or for substandard quality of care due to lack of training and supervision. It eliminates accountability and leaves those who hire caregivers through the underground "grey market" with few options if and when something goes wrong.

The list of things that can go wrong with in-home care is long, so it is important that accountability, supervision, and regulation remain part of the industry. Rules that create a preference for caregiving that lacks these important elements will only hurt those who use in-home caregiving, as well as those who provide it.

*The NPRM will increase costs, particularly due to overtime requirements*

In January 2012, NPDA, the Private Duty Homecare Association of America (PDHCA), and the National Association for Home Care and Hospice (NAHC) released the results of a national survey of home care agencies. Greater than 93 percent of home care companies surveyed by NPDA, NAHC, and PDHCA reported an expectation of a moderate to significant increase in business costs should the NPRM rule be finalized.

According to the survey, 69 percent of companies that are currently subject to a state law overtime requirements experienced moderate to significant business cost increases when the state overtime requirement took effect. These cost increases came primarily from human resources costs and not from increases in compensation paid. 67 percent of the survey respondents said they would expect this level of cost increase were the overtime requirement imposed, and 38 percent reported an actual cost increase. Similarly, survey respondents reported an expected increase of 68 percent in staff training costs.

According to an International Franchise Association Economic Analysis, in the 29 states that use the exemption 8.9 percent of the franchises provide live-in companion care. The requirement to pay overtime for periodic 24-hour care or when the caregiver lives in the home of the individual will dramatically increase the cost of this service to the point where it will not be affordable. Even Michigan, which eliminated the exemption for hourly companion care, retained it for live-in companion care.

*Proposed changes will result in many caregivers earning less*

The loss of the overtime exemption will force companies to restrict caregivers' hours to no more than 40 hours per week, and to bring in another caregiver to the work the hours in excess of 40 that a caregiver would have worked. This would affect almost a full third of the caregiver workforce—some 29 percent of caregivers work more than 40 hours in a work week. This will be true for both the private pay market and non-medical Medicaid funded home care providers. In most states, Medicaid waiver fee for service rates do not build in overtime. Furthermore, given budget cuts, states will not be likely to increase provider rates to cover changes imposed by this NPRM.

The prediction that an overtime requirement will increase costs so much that worker hours will be restricted is more than mere speculation. Nearly 63 percent of the NPDA/NAHC/PDHCA survey respondents currently obligated to pay overtime under state law reported that they restrict overtime hours. More than 86 percent of companies that would face a new requirement to pay overtime said that if the proposed rule takes effect, they will restrict the hours their employees could work in order to avoid overtime costs. DOL has suggested that this will result in more job opportunities. But because, the overall number of hours available to be worked will not increase, this increase in jobs will come at the expense of the current caregiver workforce. Current workers will see a cut in their earnings opportunities.

Consequently, caregivers would not be able to maintain their income level under their current work schedules. They will be forced to make do with less income, seek alternative employment, or seek multiple employers in order to put in the same number of hours they currently work.

The impact on caregivers who provide live-in companion care will be even greater. Without the current exemption this model is not sustainable. These caregivers will not only lose their job they will also lose their home. This will be especially true for those who serve persons with intellectual disabilities, funded through Medicaid Waivers.

*The NPRM would adversely impact continuity of care*

In-home care is intensely personal and often highly emotional, making continuity of care a critical factor. Many aging individuals are fragile, but still find it emotionally very difficult to accept the loss of independence as they advance in age. While in-home caregiving allows them to remain in their homes, seniors and people with disabilities must still accept help with personal hygiene, companionship, and mobility. Having more caregivers come into their home to provide such personal task is not an easy thing. Most clients form tight bonds with their caregiver, and find it very difficult to adjust to changes in their daily routines, especially if the changes involve more people coming into their homes.

*New recordkeeping burden will increase costs*

NPDA fully supports—and its members provide—fair pay for caregivers, but the rules must accommodate the reality of in-home care: the need for 12 and 24 hour shifts—many of which include a great deal of sleep or other "down" time. The job of a caregiver is not analogous to typical 9-to-5 jobs, yet these proposed rule changes suggest the exact opposite.

The NPRM would require employers of overnight and live-in caregivers to track actual hours worked. This can be a difficult to impossible task, particularly under the live-in companion model. While the current rule (a requirement of an agreement governing sleep and other down time for live-in caregivers) makes sense, the proposed new requirement of tracking and maintaining records of actual hours worked will increase the cost of record keeping. Plus, it would be unmanageable for the fragile seniors/people with disabilities on whom the burden of this additional recordkeeping would fall.

This new regulation would also significantly narrow the services an exempt caregiver can provide. Under the new definition, an exempt caregiver could provide only fellowship and safety services.

Personal care would be permissible only when it is "occasional" and incidental to fellowship and safety, and then only to the extent that it constitutes less than 20 percent of the time the caregiver works. The administrative cost of tracking this narrower scope of service, even if it were available to third-party employers (and under the NPRM it would not be), would also add significant new administrative costs and again be unmanageable.

*Increased costs could force loss of access to needed services or institutionalization*

Many clients are unable to stay home alone, but do not need round-the-clock nursing or medical care. The increased cost of in-home care caused by this NPRM may give these clients no choice but to move into institutional care.

Users of in-home care depend on these services, and they are growing in numbers. According to the DOL's own economic impact analysis, two in five in-home care clients are under 65 years old, generally requiring assistance due to developmental or mental disabilities. In addition to this population, the number of elderly clients for in-home care is expected to expand dramatically as the "Baby Boomer" generation reaches the age of retirement. DOL's own projection shows that while current demand for home care workers is between 3.8 and 4.6 million, it will grow to between 5.7 and 6.6 million by 2050.

According to the NPDA/NAHC/PDHCA survey, the increased costs that would result from the NPRM changes would force 81.8 percent of companies to increase their private pay billing charges. Almost 24 percent anticipate that clients will scale back—a clear, adverse impact on availability of care. Experience with similar state law requirements bear this out. In the states that require payment of overtime, 45.2 percent of companies have increased their charges and 10.4 percent have reduced care access as a result of the state overtime laws.

Simply put, fewer companies offering this specialized care means there are fewer options for clients in need, ultimately resulting in higher demand for taxpayer-funded government services.

*Increased costs of in-home care will fall largely on government programs*

DOL's economic analysis fails to understand the extent of the private pay home care market. The DOL Wage and Hour Division (WHD) economic impact analysis noted that in 2008, public programs paid 80 percent of the revenue earned by home care agencies. Only 15 percent of the agencies' revenue was paid by private insurance plans, and only five percent by clients out of personal resources. As pointed out by the International Franchise Association (IFA) Global Insight Companion Care Report of February 21, 2012, DOL included in its analysis Medicare reimbursed home health care. Since companion care services generally are not part of Medicare home health care the public funded number is inflated. This is further complicated by the fact that the majority of companionship services for the elderly are not reported.

It is however clear the increased costs of in-home care caused by the NPRM changes will generate greater costs for government programs, such as Medicaid. Costs will rise due to higher worker compensation requirements, as well as due to an increase in the number of individuals who rely on government programs for their long-term care needs. We will also see many who now private pay more quickly run out of their own resources, and thus turn to Medicaid sooner, ultimately increasing utilization of live-in facilities subsidized by government programs.

This means more federal spending at a time when budget deficits are forcing Congress to examine every nickel of every federal spending decision.

*The NPRM would incentivize an underground economy, worsening worker misclassification*

If the NPRM changes are finalized, NPDA fears that many families, unable to absorb the higher costs, will look for lower-cost caregivers. These alternative caregivers will fall into three categories: those who are employed by the family, those who believe they are independent contractors, and those who fall into the underground or grey market[2]. Families/households who employ their caregiver are unlikely to understand the complexity of the proposed NPRM, particularly as it relates to "incidental" work, payment of overtime or the responsibilities of being an employer. The second group, independent contractors, will add to the worker misclassification issue. It is unlikely that they will meet the requirements for such classification, and even more unlikely that a fragile senior, person with disabilities, or their families will even know about, much less comply with, responsibilities such as processing Form 1099. The third group, those who form the "grey market," will be much easier for the family to manage, but they will not follow FSLA rules nor will they pay taxes. Minimum wage and overtime will not be an issue for this group because they will be operating outside of employment laws.

These unsupervised, untrained, and unregulated caregivers will in many instances provide a substandard quality of care, given that anyone could open a business regardless of their competency or fitness for the job. Instances of elder abuse may burgeon, all the while leaving seniors and their families with no recourse when something goes wrong.

The caregivers will ultimately lose the protections that come with their employment from a third-party business and be forced to independently shoulder all of the inherent risks that come with work in this field.

*The NPRM will have a significant impact on the small business private duty company industry*

Private duty companies are low-margin, labor-intensive small businesses. Of the 1,428 home care agencies that participated in the NPDA/NAHC/PDHCA survey, 85.7 percent are small business with annual revenues of less than $5 million. More than 40 percent reported annual revenue of less than $1 million and 45 percent had annual revenue between $1 million and $5 million. Almost two thirds—64 percent—provide live-in caregiver services, and almost 70 percent stated that most of their revenue comes from individual clients and families or through a private insurance plan.

Clients are already stretched by the cost of in-home care. They cannot afford the substantial increase in costs that would result from a requirement to pay overtime, particularly when they require a live-in or periodic 24-hour support. Reimbursements from government programs (e.g., Medicaid) are set by law or fixed rates and would not likely be adjusted to reflect new overtime costs, forcing companies to move to different models which do not benefit those they support or their home care staff.

This NPRM will result in seniors transitioning sooner into institutional care. The loss of business will significantly impact private duty companies but more importantly it will deprive those we support of

---

[2] Grey market refers to those workers paid in cash and who do not report their income.

their choice to stay in their own home. It will also leave the caregivers with fewer hours of work.

*Conclusion*

As in-home care providers, we see firsthand how hastily-made regulations and laws can leave seniors without the support they need and can create unneeded expenses families can ill afford.

The proposed changes could ultimately lower pay for caregivers, harm continuity of care, threaten the economic viability of private duty companies, increase federal spending on government programs, create a significant loss of federal and state revenue, and incentivize an underground "grey market," populated by untrained, unsupervised, and unregulated caregivers for whom taxes are not paid.

For these reasons, NPDA urges the DOL to withdraw this NPRM due to the harm it will cause to those who need in-home care, the caregivers who provide it, the companies that employ those caregivers, and the taxpayers who pay for government-subsidized long-term care.


Sincerely,

*Sheila McMackin, LCSW*

Sheila McMackin, LCSW
President, Board of Directors
National Private Duty Association