# TAB G



Andrea L. Devoti, MSN, MBA, RN
*Chairman of the Board*

**NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE**
228 Seventh Street, SE, Washington, DC 20003 • 202/547-7424 • 202/547-3540 fax

Val J. Halamandaris, JD
*President*

March 21, 2012

Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
United States Department of Labor
Room S-3502
200 Constitution Avenue, NW
Washington, D.C. 20210

Re: Application of the Fair Labor Standards Act to Domestic Services; 76 Fed. Reg. 81190 (December 27, 2011)

Dear Ms. Ziegler:

Thank you for the opportunity to provide comment on the proposed rule:  Application of the Fair Labor Standards Act to Domestic Services; 76 Fed. Reg. 81190 (December 27, 2011). This proposal will have significant impact on access to home care services for millions of elderly and infirm, the workers who provide home care, the businesses that deliver such services, and the public programs that often pay for the care. We urge the Department of Labor to proceed very cautiously on its proposal. Specifically, we recommend that the Department withdraw the current proposal, initiate a comprehensive and focused study of the actual and expected impact of the proposal on all affected parties, and consider the wide range of alternatives to the current proposal before moving forward.

There are very strong indications that the Department did not accurately or sufficiently evaluate the impact of the proposal as it: (1) relied upon data from programs that do not fund "companionship services," (2) failed to develop the basic and essential information necessary to understand the proposal's impact on privately purchased care, (3) fell far short of a reliable analysis of the proposal's impact on Medicaid and other public program spending, (4) provided no analysis of impact on the wholly distinct services of live-in caregivers, and (5) failed to take advantage of the opportunity to evaluate actual impact occurring in the states where the "companionship services" exemption from overtime compensation has already been eliminated or modified rather than acting on pure assumptions. Additionally, the Department's proposal rests on a very shaky legal foundation of alleged authority to modify the 37 year-

1

old definition of companionship services and the application of the exemptions to third-party employed caregivers.

The National Association for Home Care & Hospice (NAHC), along with its affiliate the Private Duty Home Care Association of America, represent the interests of the thousands of companies that provide home care services to nearly 12 million people of all ages annually. These businesses employ over 2 million dedicated caregivers that support the millions of spouses, parents, children, relatives, friends and neighbors that often are the primary caregivers to the home care patients and clients. It is well recognized that home care provides significant dynamic value by offering high quality care at substantially less cost than institutional care while also helping to prevent costly complications that lead to hospitalizations and other costly medical services.

NAHC and the caregivers we represent share the Department's goal to provide fair and reasonable compensation to home care aides and personal care attendants. The jobs that they take on are essential, particularly as our society ages with millions of "baby boomers." Also, the work that they do is hard and can only be done by dedicated individuals who understand its importance and appreciate the privilege of caring for vulnerable elderly and infirm.

Specifically, NAHC does not oppose overtime compensation. However, we do not support the Department's proposal that would institute a national requirement for overtime compensation as an isolated and non-integrated element in the delivery system of home care, thereby disregarding the impact on publicly funded services, services purchased by the elderly who have limited incomes, and the workers who will experience depressed base wages and restricted working hours because employers will be unable to cover the cost of overtime with shrinking Medicaid payment rates and the inability of private purchasers to afford the care.

The Department must recognize that a strategy directed at overtime compensation alone will not help home care workers. Any compensation strategy must consider and incorporate other elements as well including base wage rates, career growth opportunities, health insurance and other fringe benefits, increased payment rates from public programs such as Medicaid, and support for the elderly and infirm who cannot afford higher care rates. To push overtime compensation alone in the face of the other forces at play in this marketplace will only lead to compromised wages and restricted working hours for hardworking caregivers. This is directly evidenced by existing data, the Department's own analysis and the comments of those purporting to represent the interests of the worker.

There is no need to rush the proposal to a final rule. If the Department's analysis is correct, very few workers would qualify for overtime and many of those will end up with restricted working hours as the employers respond to the new requirement by avoiding scheduling workers for more than 40 hours in a week. In terms of opening up new job opportunities, there are many current openings for home care workers and the Bureau of Labor Statistics forecast continued growth in demand. However, if the Department's view of limited impact is wrong, home care consumers, workers and public programs are put a great risk of negative consequences. Accordingly, NAHC strongly recommends that the Department initiate the necessary comprehensive research and study to determine the real impact of any changes with far less reliance on seemingly endless assumptions before proceeding.

Aside from the many assumptions employed by the Department in its analysis, there are crucial undisputed facts that are relevant and material to appropriate policy relative to the companionship services and live-in exemptions:

2

1. All stakeholders in this matter, along with the Department itself, agree that the proposal will increase the cost of care for direct consumers as well as public programs. The disagreement on this matter is how much cost will increase.
2. All stakeholders also agree that the primary result of the imposition of an overtime compensation obligation for home care workers will be an employer's restriction in working hours to eliminate or limit the risk of an overtime cost.
3. The Department did not evaluate, through use of any specific data or analysis with targeted information, the impact of the proposals on access to and cost of live-in services for the elderly and disabled who need personal care supports for activities of daily living. Instead, the Department simply applied its analysis of hourly, part-time personal care services to full time live-in caregivers.
4. The Department focused its attention on certain public programs such as Medicare and Medicaid to the near exclusion of consideration of privately purchased home care by assuming that such services were a mere incidental part of home care.

The undisputed facts and findings are combined with a series of very important, but unsubstantiated assumptions:

1. Public programs such as Medicaid will modify payment rates to ensure any increased costs triggered by the overtime compensation obligation are fully reimbursed on a timely basis.
2. The change in the overtime compensation obligation will reduce turnover of workers providing home care.
3. There will be no adverse impact on the quality of care.
4. Any restriction on work hours to control overtime costs will create new job openings that will help the nation's economy.
5. Currently overworked workers will have an improved quality of life leading to better job performance in service to the elderly and person's with disabilities.

When the undisputed facts are combined with these assumptions, only one logical conclusion results: the Department must be very sure about the bona fides of the underlying rationale for its proposal and be reasonably certain about the likely impact of the rule change before proceeding. The facts alone would dictate that the rule be withdrawn or significantly redrawn. However, if the Department is also wrong in its assumptions, the consequences to workers, consumers, and public programs could be disastrous.

In fact, it is the workers that are at greatest risk. NAHC strongly believes that the Department's assumptions are not well founded. First, public programs such as Medicaid are already in financial jeopardy across the country. One prime example is California where the governor has sought significant reductions in payment rates to providers of home care, both home care agencies as well as to hundreds of thousands of individual caregivers. California is far from alone with reductions in the payment rates and scope of home care benefits occurring in such other states as North Carolina and New York.

Second, the Department is aware that there is a great risk of higher worker turnover as an impact of the proposed rule. At a recent "Roundtable" held by the Small Business Administration, the Department learned first hand from a home care agency executive that the shift to an overtime compensation obligation in Michigan in 2006 significantly increased staff turnover. Such consequence is intuitively logical when combined with the recognition that employers will restrict working hours to avoid overtime costs. Workers facing lower overall compensation will seek other employment. As such, consumers suffer because of the loss of experienced caregivers, businesses experience higher staff recruitment and training costs, and workers either lose income or the opportunity to work in home care.

3

Third, while there is no study of the impact of an overtime obligation on quality of care, it is far from safe to assume that it will improve care. Instead, it is more likely that the increase in staff turnover will negatively impact care quality as inexperienced workers take over for departing caregivers and the assignment of multiple caregivers with restricted work hours naturally leads to deterioration in care consistency.

Fourth, it is very likely that the assumption that the rule change would create new job openings is accurate. However, is that really a good impact? Currently, home care is already struggling with increasing demand for caregivers, not an oversupply of individuals looking for such jobs. The Bureau of Labor Statistics also notes that the demand for such workers will be rising exponentially as the nation ages. The shortage of workers for these jobs is not a creature of the lack of overtime compensation, it is because the work is hard and only certain people fit the demands of caregiving. These jobs pay well in excess of minimum wage, yet have more openings than jobs that pay at the minimum.

Fifth, there is no data or factual support for the contention that workers are overworked and that restriction in working hours will improve quality. Unlike the experiences in hospitals and institutional care settings where nurses and other workers have been subjected to "forced overtime", there is no such activity ongoing in home care. A large segment of home care workers are employed on a part-time basis and employers in home care are noted for offering very flexible working hours. In fact, home care companies routinely report that it is the workers who seek more hours, not the employers demanding that the employees work more.

The perfect opportunity exists for the department to test their assumptions and gain a real understanding of the impact of the proposed rule to a level of accuracy generally not available. That opportunity lies in those states that have eliminated the application of the companionship services exemption already. In fact, two states that recently did so through legislation or regulatory interpretation, Michigan and Pennsylvania respectively, would be perfect testing grounds allowing for a near contemporaneous review of the "before and after." A thorough review of the consequences of the changes in those states would better inform the analysis and debate on this matter than the impact analysis undertaken to date by the department. Accordingly, NAHC recommends that the Department initiate such an analysis before proceeding. It is the best way to avoid the potentially dire consequences to all stakeholders as discussed above.

## CONCERNS ON THE LEGAL VALIDITY OF THE PROPOSAL

The substance of the proposed rule raises several important concerns about its legal validity. NAHC participated in the case, *Long Island Care at Home v. Coke* before the U.S, Supreme Court and the positions taken by the Department in this proposed rule change are in direct contradiction to its position advanced to the Court. Further, the proposed rule is at odds with the unambiguous language of the FLSA. Finally, the Department's initial impact analysis falls far short of requirements under the Small Business Regulatory Flexibility Act. These matters must be addressed by the Department before it can move forward with any proposal to change these rules in issue.

**First,** the proposed redefinition of "companionship services" is in direct conflict with the language of the Fair Labor Standards Act as well as its legislative history. Specifically, the FLSA applies the exemption to employees providing "companionship services for individuals who (because of age or infirmity) are unable to care for themselves." This exemption relates to care, not "fellowship" a term never referenced in the law.

4

Specifically, 29 U.S.C. 213(a)(15) applies the exemption from overtime compensation to:

"any employee employed in domestic services employment to provide companionship services for individuals who(because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary."

The operative word defining "companionship services" is "care" and the focus of the care is the elderly and infirm. However, the Department proposes to minimize the "care" aspect of companionship services and shift the definition fully towards the concept of "fellowship." In doing so, the proposal directly offends the mandate in section 213(a)(15) of the FLSA and effectively guts the usefulness of the exemption for the elderly and infirm. Fellowship is something that is not generally purchased thereby making concerns about worker compensation irrelevant. Fellowship comes by way of ones friends, family, church, clubs, fraternity or sorority, or by using Facebook. While it may be possible that a person "buys" a friend, it is highly unlikely that there would be an overtime need for one.

More importantly, "fellowship" is not what elderly or infirm persons who cannot care for themselves need, it is actual care. The current rule recognizes such and has done so effectively since 1975. The proposal is in direct conflict with the statutory mandate that the Secretary define and delimit the companionship services exemption within the parameters of workers providing <u>care</u> to the elderly and inform, not fellowship.

The legislative history fully supports the companionship services definition currently in force. By focusing on caring for the infirm and elderly in enacting the companionship services exemption, Congress targeted our nation's most vulnerable population. Improving the opportunities for the elderly and person's with disabilities to remain in their own homes, with families, avoiding more costly institutional care is the central purpose behind the exemption. *See* 118 Cong. Rec. 24715 (July 20, 1972) (statement of Senator Taft noting that certain domestic services are directed to caring for the elderly in their homes and preventing nursing home placement): 119 Cong. Rec. 24801 (July 19, 1973) (statement of Senator Burdick indicating the exemption relates to aged or infirm fathers and mothers who need someone "to take care of them).

Fellowship does not include the care needed to keep someone from being forced to be admitted in a nursing home. One can have 24/7 fellowship and require nursing home placement to receive the care needed to meet activities of daily living (ADLs) and instrumental; activities of daily living (IADLs). The type of companionship services that provide the opportunities to avoid institutional care are the caregiving services that have been defined as companionship services since the exemption was enacted in 1974. The passage of time and the changes in the business of providing such care have not changed those needs for care.

**Second,** excluding employees of third-party employers from the application of the exemption is in direct contradiction to the language of the FLSA and the position advanced by the Department of Labor at the US Supreme Court in *Long Island Care at Home v. Coke*. The law applies the exemption to "any employee."  Specifically, 29 USC 213(a)(15)uses the phrase "any employee employed in domestic services" without any qualification as to the identity of the employer.

In 1974 when the FLSA companionship services exemption was enacted, Congress well understood what legislative language was needed to exclude application of the exemption to third-party employment. In fact, Congress expressed clear awareness of a recently enacted provision in the Social Security Act that contained such language when deliberating the companionship services exemption. S. Rep. No. 93-690, 93rd Congress, 2d Session at 18. (This bill would bring under minimum wage and

5

overtime provisions of the Act all employees in private household domestic service earning "wages" ($50 per quarter) for purposes of the Social Security Act, but retains a minimum wage and overtime exemption for…companions…").

Under Public Law 92-5 (March 17, 1971), Congress expanded the application of the Social Security program to domestic services, but specifically excluded taxing wages from a certain subclass of domestic services.  Specifically excluded is:

"(6)(A) Remuneration paid in any medium other than cash to an employee for service not in the course of the employer's trade or business or *for domestic service in a private home of the employer*;

(B) Cash remuneration paid by an employer in any calendar year to an employee *for domestic service in a private home of the employer* (including domestic service on a farm operated for profit), if the cash remuneration paid in such year by the employer to the employee for such service is less than the applicable dollar threshold (as defined in section 3121(x) of the Internal Revenue Code of 1986) for such year;

(C) Cash remuneration paid by an employer in any calendar year to an employee for service not in the course of the employer's trade or business, if the cash remuneration paid in such year by the employer to the employee for such service is less than $100. As used in this paragraph, the term "service not in the course of the employer's trade or business" does not include *domestic service in a private home of the employer* and does not include service described in section *210(f)(5)*; . . . ."

42 U.S.C. § 209(a)(6).  (Emphasis added.)

Consistent with this statutory language, implementing regulations distinguish the nature of domestic services from the identity of the employer.  Under 42 C.F.R. § 404.1057(b), domestic services "is work of a household nature" including such services as those performed by cooks, waiters, butlers, maids, and housekeepers.  It does not include "services performed as a private secretary, tutor, or librarian, even though performed in the employer's home."  42 C.F.R. § 404.1057(b).

The Congressional awareness of language necessary to limit application of provisions of law related to domestic services *in the home of the employer* is further found in the Internal Revenue Code.  The tax code is replete with references to "domestic service in a private home of the employer" as distinguished from the more general concept of "domestic services."  *See, e.g.*, 26 U.S.C. §§ 3510(c); 3121; 3306; 3401; and 3102.  Unlike the tax code, the FLSA contains no comparable qualification.

It is apparent that Congress understood the concept of "domestic services" to relate solely to the nature of the employee's activities.  Further qualifications such as location ("in a private home") and the identity of the employer ("… of the employer") are necessary to establish intended limitations.  The Department's proposal to include and limit the identity of the employer in the application of the companionship services exemption overextends the reach of the concept of "domestic services" under 29 U.S.C. § 213(a)(15).  It would be wholly illogical and inconsistent for Congress to intend different definitions of the same employment category, "domestic services," under the Fair Labor Standards Act, the Social Security Act, and the Internal Revenue Code.  *Barnhart v. Walton*, 535 US 212, 221 (2002) (The same statutory words should not be interpreted differently in closely related contexts); *citing*, *Department of Revenue of Oregon v. ACF Industries, Inc.*, 510 US 332 (1994).  It is plain that Congress was aware of the language needed to qualify and limit the category of employer for the companionship services exemption in 1974.  Congress did not so limit its application to a distinct set of employers under the FLSA.  The Department's proposal to end application of the companionship exemption to third-party employed workers violates the FLSA unambiguous mandate.

6

The Department relied on this language in defending its current regulations at the Supreme Court in 2007. In its amicus brief in *Long Island Care at Home, Ltd., et al v. Coke,* the Department stated that:

> "The statutory exemption applies to "*any* employee employed in domestic service employment to provide companionship services."  29 U.S.C. 213(a)(15) (emphasis added). Congress's use of the encompassing term "any" is a natural read to include all employees providing such services, regardless of who employs them...
>
> If Congress had wanted to exclude employees of third-party employers from the exemption, it easily could have done so by expressly including a limitation based on employer status, as it has done with other FLSA exemptions…
>
> [The third-party employer rule] also is consistent with Congress's intent in enacting the exemption for companionship services in the first place, and it avoids the disruption to the provision of companionship services to aged and disabled individuals that would result if regulation were invalidated…
>
> Allowing the exemption for all employees providing companionship services, regardless of the identity of their employer, is consistent with Congress's intent to keep such services affordable. See 119 Cong. Rec. 24,797 (1973) (statement of Sen. Dominick); *id.* at 24,798 (statement of Sen. Johnston); *id.* At 24,801 (statement of Sen. Burdick); *Welding,* 353 F.3d at 1217 ("Congress created the companionship services exemption to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them.") (internal quotation marks and citations omitted). This affordability concern applies regardless of whether a person needing care employs a companion directly or uses a third-party agency to obtain such services."

The Department's only explanation for its change in position is the allegation that the businesses providing personal care and home care aide services to the elderly and persons with disabilities have grown in numbers and size. However, the businesses changes have nothing to do with the purpose behind the exemption—to keep people out of nursing homes and make home care an affordable alternative. In fact, with the growing population of people needing such services, the importance of the exemption applied as it has since 1975 has grown as well.

There is no indication in 213(a)(15) that Congress intended the companionship services exemption to apply only to the elderly and infirm that have the wherewithal and financial capabilities to take on the difficult tasks required of employers. However, that is the direct consequence of the Department's proposal. Those using companionship services who do not want the cost of overtime compensation must take on the complex role of an employer with all of its administrative obligations and financial liabilities. In doing so, the person gains the benefit of the exemption but also loses the benefits of state-designed consumer protections that address everything from worker background checks and competencies to professional oversight. The Department's proposal sacrifices the option of a third-party agency model of care for consumers to bring the illusion of higher compensation to workers. Congress stuck a conscious balance between the consumers and the workers and did not authorize the Department's proposal to restrict the exemption to direct employees of the consumer.

**Third,** the proposed rules have existed essentially with identical standards since the original rulemaking proceeding in 1975. Congress has had many opportunities to change the law in line with the

Department's proposal. Where Congress does not find sufficient reason to change the law over 36 years, the legal validity of the current proposal is called into serious question. Since the ruling of the U.S. Supreme Court in *Coke,* Congress has had several opportunities to enact legislation that would achieve the changes that the Department now proposes in a regulation. See, Fair Home Health Care Act, H.R.3582; Fair Home Health Care Act of 2007, S.2061; Direct Care Job Quality Improvement Act of 2011, S.1273; Direct Care Job Quality Improvement Act of 2011, H.R.2341; Direct Care Workforce Empowerment Act S.3696; Direct Care Workforce Empowerment Act, H.R.5902.

Each of these efforts were attempts to modify 213(a)(15) in a manner virtually identical to the Department's proposed rule change. Each would have eliminated the longstanding application of the companionship services exemption to third-party employed workers. Each would have eliminated the application of the exemption to any worker who was employed on more than a casual basis. These legislative efforts never cleared the respective house of Congress let alone the Congress overall. In fact, each had only a small numbers of cosponsors with S. 2061 getting the high-water mark in the Senate at 11 and HR 2341 garnering 35 in the House.

The Department's complete turnaround in its interpretation of the law as proposed has doubtful validity. It's very clear previous legal position on the FLSA companionship services exemption is totally inconsistent with the present proposal. Also, Congress's clear unwillingness to change the 37 year-old rule defining and delimiting the Department's exemption is a strong indicator of the validity of the existing FLSA interpretation and application. Most importantly, the fact that the Department's rationale for keeping the rule as is in 2007 still exists today—keeping the elderly and persons with disabilities out of institutional care and in their own homes.

**Finally,** the analysis by the Department of Labor regarding the likely impact of the proposed rules falls very far short of the analysis required under the Small Business Regulatory Flexibility Act, the Paperwork Reduction Act, and Executive Orders 12886 and 13563. While the Department offers a lengthy impact report, it has several major failings at its core. Given the potential impact of the proposal, the Department should be held to a very high standard of accuracy and completeness in its impact analysis.

The analysis misses completely one of the most significant forms of home care—privately purchased personal care. It is estimated that several million elderly and persons with disabilities use such care through 20,000 companies with an estimated $25-30 billion in annual expenditures.

The Department and others contend that Medicare and Medicaid make up 89% of total spending on personal care services. However, Medicare spending on personal care services, as part of a skilled care home health benefit, is less than $1 billion annually. Medicare requires that the patient be homebound and in need of intermittent care. 42 U.S.C. 1395f(a)(C). If qualified, the person can receive part-time care from a home health aide, 42 U.S.C. 1395m. That care can include some personal care, but also includes assistance with medication, non-complex wound care, and therapy exercises from a certified home health aide in contrast to a personal care attendant. Medicare home health aides are subject to detailed training and competency testing requirements. 42 CFR 484.32. Personal care is only one part of their functions. As such, the application of the $19 billion in total Medicare home health spending to the analysis of the impact of the Department's proposal is wholly misplaced.

Medicaid spending on personal care and home care aides is approximately $25 billion. However, it is difficult to determine exactly how much of such care fits within the current "companionship services" definition. Assuming that all of such Medicaid spending is on care that could be classified as

8

"companionship services (an assumption that is a very generous one in this matter), it becomes apparent that the Department examined the wrong business in its impact evaluation. It should have looked mostly at private pay personal care and Medicaid while ignoring Medicare data.

All told, it is estimated that private pay personal are services represent nearly half of all spending on care that could be classified as "companionship services" under the current rule. Most of the remaining comes from public programs such as Medicaid and the Older American's Act. Only an incidental portion comes by way of Medicare. A compliant impact review would necessitate a thorough examination of private pay home care.

The Department's impact analysis is also devoid of any evaluation of live-in services. This unique segment of home care is virtually all on a private pay basis. Medicaid is a payer of some live-in care, but most states do not provide such a level of coverage. The impact on live-in care and caregivers cannot be simply assumed by using Medicare data or even the limited, but unrelated data on Medicaid home care services. It is a service that is wholly different from most public program home care.

Live-in care has elements that make for obvious distinctions in terms of its nature and its "compensation" to workers. The live-in worker generally has significant free time and is not actually working 24/7. Also, the live-in has a wide variety of responsibilities, often including personal care when working as a caregiver rather than a maid or housekeeper. Another significant factor is that the live-in worker gets housing and even meals in some instances as part of their compensation---elements that are not calculated into the determination of wage levels in the Department's proposal. That means that the wages and the value of housing and meals combined far exceed minimum wage levels.

The Medicaid beneficiaries that receive covered live-in services are quite varied and unique in their needs and circumstances. With the Department's proposal, these individuals are at serious risk of losing all care in the community setting. These individuals include college students with Medicaid paid "roommates" who also attend college. They include individuals who work and take their caregivers to work with them. They are individuals who can have their needs met during the day, but need an overnight live-in to address intermittent needs. The Department's impact analysis indicates clearly that these consumers, the workers who care for them, and the programs that support them were not examined or reviewed with any specificity.

The utter absence of sufficient evaluation of the proposal's impact on live-in services warrants an immediate withdrawal of the proposal. If the Department wishes to proceed with its live-in rule change, it should start at "square one" and comprehensively analyze the employment circumstances and the effect that any change will have on all stakeholders. Simply applying an analysis that is inadequate in relation to hourly care to the highly distinct live-in care is not acceptable or compliant with the Department's obligation.

NAHC, along with the National Private Duty Home Care Association, conducted a study (Appendix 1) of the impact of the Department's proposal. This nationwide survey, including private pay home care and live-in services providers, indicates the following adverse impacts:

1. Moderate to significant increases in care costs
2. Restrictions in overtime hours to the detriment of the workers overall compensation
3. Loss of service quality and continuity

9

4. Increased costs passed on to the patients and public programs that would decrease service utilization, increase unregulated "grey market" care purchases, and increase institutional care utilization rather than absorbing and covering the higher cost of care.

The survey protocols began with the identification of the universe of survey targets. NAHC and NPDA did not limit the survey universe. Instead, through various communications from both NAHC and NPDA, as well as industry publications and state home care associations, the survey was open to all interested home care companies.

For your reference, the survey questions are in Appendix 2. As you will note in reviewing the survey questions, the survey was intended to elicit responses covering the broad range of potential answers as well as leaving an open input opportunity for the respondents to include narratives in the event that the respondent had an answer that was not on the listed options or wished to elaborate on his/her answer. For example, with respect to the question on the impact of overtime pay on quality of care, response options included: no impact; minimal deterioration; moderate deterioration; significant deterioration; minimal improvement; moderate improvement; significant improvement; and unsure. This is a very typical survey method wherein respondents have the full range of response options to avoid any survey bias.

For further reference, the entire survey response results are found in Appendix 3. These results are unedited and raw, without any analysis or editorial review. The results raise serious questions about the Department's impact analysis and findings. In fact, these survey results depict an entirely different industry than the one displayed in the NPRM impact analysis. The main reason for the differences is that the NPRM analysis focused primarily on Medicare, Medicaid and other public programs to the near exclusion of the private pay side of home care services—a large and important segment of "companionship services" and live-in care. Another reason for the differences is that the survey study is real time and not reliant on the vagaries of non-uniform publicly reported data. Instead, it focused on impact directly, going to the first-line source of the most pertinent information—the employers of caregivers. In addition, it provides information about the actual, rather than forecasted impact from the states where overtime compensation is already a requirement. This information is extraordinarily useful in forecasting the impact of the Department's proposal.

The study demonstrates that the potential adverse impact on patients, workers, public programs, and the business that employ caregivers is real and significant. While we do not take the position that the study is the "be all" of impact analyses, the insights gained from this study demonstrate that the Department's data sources and analytic methodology fall short of the comprehensive and accurate review of the potential impact of the proposed rule. Further, those insights depict consequences that warrant additional review and evaluation prior to the advancement of any changes in the longstanding standards under the companionship services exemption. These consequences are intuitively sound and reasonably foreseeable given the overall market context of home care. In addition, the proposal would adversely affect too many stakeholders in home care to ignore and move on to a final rule at this point. Higher care costs, restricted working hours for caregivers, reduced quality of care, and increased demands on financially fragile public programs should not be the intended results of a rule change.

Further, an analysis by Navigant Economics confirms that the Department fell far short of the depth and accuracy needed to produce the mandated impact analysis sufficient to protect the public from harmful policy changes. Navigant Economics uncovered essential flaws and weaknesses in the Department's analysis, indicating that it would be prudent to re-initiate a comprehensive review before proceeding further with the proposed rule change. The report, "Estimating the Economic Impact of Repealing the FLSA Companion Care Exemption," by Jeffrey A. Eisenbach, PhD. And Kevin W. Caves,

10

PhD., (hereinafter "Navigant Report") is a significant contribution to the dialogue on the companionship services and live-in issues.  The report can be found at: http://ssrn.com/abstract=2017109.

While we suggest that the Department carefully review the entire Navigant Economics report, several highlights are worthy of note. Navigant concludes that the Department's impact analysis:

1. "systemically understates the costs of the proposed rules while overstating potential benefits. Navigant Report at 12.
2. "assumes away or understates several important types of compliance costs." Navigant Report at 15.
3. "understates deadweight loss (a) by assuming, explicitly and incorrectly, that elasticity of demand for companionship *labor* is extremely low; and (b) by implicitly and incorrectly assuming that elasticity of demand for companionship *services* is zero (perfectly inelastic). Navigant Report at 15-16.
4. fails "to distinguish between live-in care   and hourly care [causing] it to under-estimate the overtime cost burden for the live-in industry by roughly a factor of eighteen." (footnote omitted) Navigant Report at 20.
5. ignores real and significant quasi-fixed costs, regulatory familiarization and recordkeeping costs, and added travel costs Navigant Report at 23-28.
6. "ignores altogether the disproportionate impact of the repeal on the market for live-in care." Navigant Report at 28-31.
7. fails to recognize that the home care industry "is far more responsive to changes in Labor costs than the PRIA assumes… the demand for companionship care workers is found to be elastic, implying that a one percent increase in labor costs causes employment to decline by more than one percent, causing aggregate worker compensation to decline." Navigant Report at 43.
8. "dismisses concerns about continuity of care based on little more than speculation based on studies showing the impact of long hours on medical error rates." Navigant Report at 48-49.
9. fails to recognize that , "It is certain [with the proposed rule changes] that the demand for institutional care will increase, perhaps substantially." Navigant Report at 49.
10. fails to consider viable alternatives such as continuing to allow individual states to regulate minimum wage and overtime provisions in relation to companionship services and  fails to gather the necessary data to demonstrate the value of the proposed changes as required under OMB Circular A-4. Navigant Report at 51-53.

The Navigant Report adds to the body of evidence demonstrating that changes to the longstanding FLSA rules on companionship services and live-in care are not ripe for action. The layers of assumptions and impact speculation offered by the Department fall far short of the reliability level sufficient to justify this significant policy change. There is too much at risk to act hastily particular when those risks are shared by workers, consumers, and payers alike. It is even of greater concern when the consumers are the most vulnerable of our citizens, the workers already have compensation concerns, and the public programs financing the care are obviously very fragile.

While the Navigant Report highlights major weaknesses in the PRIA as it relates to companionship care, the surprising changes regarding live-in services deserve special notice. Unlike the companionship services exemption, the separate live-in exemption has not had over a decade of attention by the Department or the stakeholders. The data on companionship services is weak at best and it is necessary that there be original, ground up granular research to determine if changes are necessary and warranted with its rule. However, the live-in care impact review falls very far short of the companionship rule analysis. The reason is obvious: the Department

11

did not look at live-in services beyond assuming that the impact is negligible. If it had it would quickly realize that there is no public data to determine impact. The proposal on the live-in rule should be withdrawn until the Department has sufficient information to understand that separate industry and the potential impact on consumers and workers.

**REPORTS OF HIGH PROFIT MARGINS ARE WHOLLY ERRONEOUS**

At a March 20, 2012 hearing before the House Subcommittee on Worker Protections, the Department's witness, Nancy C. Leppink, Deputy Administrator, Wage and Hour Division, and the Ranking Member of the subcommittee, Hon. Lynn Woolsey, indicated that home care companies can absorb any costs associated with the proposed rule, including overtime costs, because the companies have generally high profit margins of 30-40%. It appears that such figure came from the December 2010 Franchise Business Review article entitled, "Senior Care and Home Healthcare Franchises. However, that article referenced "gross Profit Margins" not net profit margins. The concepts are entirely distinct with net margins being the metric that sets out profit after all costs. Gross margins look only at direct costs and exclude many of the natural and necessary costs of running any business. It is clear that the net profit margins of home care companies are nowhere near the claimed levels.

There are five public companies providing home care services that encompass to varying degrees the personal care services that potentially could be classified as companionship services under the existing rule. They include Addus, Almost Family, Amedisys, Gentiva, and LHC Group. Those companies' net margins as of March 19, 2012 range from 1.02 to 7.11 percent. http://biz.yahoo.com/p/526qpmd.html. In addition, the company that is presented by some proponents of the proposed rule change, Addus, reported a December 31, 2011 net profit margin of 3.64 percent. http://ycharts.com/companies/ADUS/profit_margin.

It should be noted that these five companies represent just a small slice of the overall home care providers. However, their financial performance fits within the range of the rest of the industry. NAHC maintains a database on cost reports submitted to Medicare annually by home health agencies across the country. These cost reports include data on both Medicare and non-Medicare revenues. These cost reports do not include what is known as hospital-based home health agencies as their filings do not allow for home care specific analysis on overall home care margins. With 6604 cost reports encompassing 2010 filings, the overall profit margin average is 3.15%. This margin represents a total of $48,644,977,360 in revenues with more than $34 billion of that from non-Medicare sources.

These data do not evidence a provider group with exorbitant profit margins sufficient to absorb added costs of providing care.   The 30-40% margin reference expressed by the Department comes from Gross Margins which have nothing in common with Net Margins.

The Medicaid payment rates for personal care services further tell the real story on the ability of providers to bear the additional costs of overtime or alternative costs of hiring and training additional workers if care hours are restricted to avoid overtime costs. For example, in Texas, the state pays $10.41-11.56 per hour depending with providers obligated to pay attendants

90% of the designated labor portion which ranges from $8.34-9.49 per hour. In Georgia, the personal care service rate is $9.00 per hour. South Carolina offers $11.40 per hour with neighboring North Carolina at $13.80. Ohio provides $17.12 per hour, but rates were decreased by 3% in July 2011, an example of a national trend.

These payment rates are far lower than the Department has understood and certainly do not support any claim of high profit margins for the businesses that provide the care to elderly and infirm citizens. Nor do these rates and the state trends downward on rates support a contention that additional costs can be absorbed without adverse consequences to workers and clients alike.

Simply put, the Department's numbers are wrong and actual margins in home care fall far short of permitting additional costs to be absorbed without adverse consequences to patients/clients, workers, public funding programs, and overall business viability.

## RECOMMENDATIONS/ALTERNATIVES

NAHC recommends that the Department of Labor consider the following alternatives to the proposed rule.

1. Withdraw the NPRM and initiate original and focused research on the impact of any changes to the companionship services and live-in exemption rules before proceeding further.
2. Allow individual states to determine what changes fit best for their individual home care market in order to best fit the employment marketplace, the state-specific structures regulating the quality of home care services, and the state's Medicaid program as the primary public payer of personal care services.
3. Separate the companionship services exemption policy change proposal from the live-in exemption proposal, withdrawing the live-in proposal and proceed with separate and comprehensive analysis on live-in impact.
4. Develop a home care specific minimum wage and overtime compensation policy that addresses the unique working hour arrangements such as shift care, hourly service visit-oriented care, intermittent work days, and "work weeks" that are not a standard 7 days. This is similar to the approach taken in other health care sectors such as hospitals and nursing homes.
5. Examine state-specific approaches to overtime compensation in home care that can achieve a reasonable balance between the interests of consumers and workers. This would include overtime triggered after a certain point in the day (MN) and overtime connected to minimum wage levels rather than actual hourly wages (NY).

13

6. Allow daily compensation arrangements, without hourly time/function logs as proposed, between live-in workers and their clients to take into consideration issues of sleep time, breaks, meal time and the cost of such to the client and value to the worker.

7. Withhold issuance of any final rule that requires overtime compensation to companions (as currently defined) until states revise Medicaid payment models to address the increase in costs to assure that workers are allowed to work into overtime to qualify for the added compensation.

8. Ensure even application of any changes in the companionship services and live-in exemption rules to all workers providing personal care services to the elderly and disabled including agency workers, individual providers working in consumer directed care programs under Medicaid where the employer's identity is unclear, and workers directly employed by consumers and their families. This will prevent a shift to "grey market" unregulated providers of care.

9. Provide sufficient lead time to adjust to the new obligations. Employers of home care aides will require at least one year to address the myriad of issues presented by the proposed rule if care disruptions are to be avoided. The companies will need to modify staff scheduling, hire and train additional staff, and work with Medicaid rate setters to attempt to secure payment rate adjustments.

10. Maintain an exemption from overtime compensation while requiring payment of minimum wages.

CONCLUSION

Thank for the opportunity to submit these comments. NAHC stands ready to work with the Department and all other stakeholders to devise a reasonable strategy on worker protections for those that take on the essential task of caring for our most vulnerable citizens.

Very truly yours,

William A. Dombi
Vice President for Law

14