AFFIDAVIT

I, William A. Dombi, hereby swear or affirm in the District of Columbia that the following statement is true, based upon personal knowledge:

1. I serve as Vice President for Law of the National Association for Home Care and Hospice (NAHC), one of the Plaintiffs in the pending action captioned Home Care Association of America v. Weil, No. 1:14-cv-00967 (D.D.C.). NAHC is a trade association, along with its affiliate the Private Duty Home Care Association of America, which represents the interests of over 6,000 companies that provide home care services through over 2 million dedicated employee caregivers. I am also familiar with the membership of the other Plaintiffs in this action, the Home Care Association of America and the International Franchise Association.

2. All of the Plaintiffs have many members that employ workers currently subject to the Fair Labor Standards Act (FLSA) companionship services and/or live-in domestic services exemptions. Section 552.6 of the new Rule of the Department of Labor (the "Department") that redefines "companionship services," if allowed to go into effect on January 1, 2015, will directly, permanently, irreparably, and adversely impact the business and client interests of the Plaintiffs' members.  The purpose of this Affidavit is to provide sworn evidence of such harm, in support of Plaintiffs' Emergency Motion for Temporary Stay of Agency Action.  Comments previously filed by the Plaintiffs that are already part of the Administrative Record are incorporated by reference herein.

3. Many of Plaintiffs' members currently provide care that has long been deemed to be an integral part of "companionship services" under the statutory exemption for such services and the Department's longstanding enforcement of that exemption in the current 29 CFR 552.6.  The purpose of such caregiving is to meet the Activities of Daily Living (ADL) needs of their clientele. The core business of these members is personal care and personal care support to the elderly and persons with disabilities that is needed for these clients to stay in their own homes and outside an institutional care setting. These services would not meet the revised definition of "companionship services" set out in the revised section 552.6 as such is set out in 78 Fed. Reg. 60,454 (October 1, 2013) as the new definition limits personal care and housekeeping tasks to no more than 20 percent of the hours worked by the employee.  Because personal care is integral to companionship, such caregiving services cannot as a practical matter be confined to the Department's newly restrictive 20 percent standard. Essentially, the Department's changed definition makes the "companionship services" exemption under the FLSA inapplicable to the businesses of Plaintiffs' members and thousands of other public and private employers employing more than 90% of all companionship employees.

4. The harm that the change in the definition of "companionship services" will have on the interests of Plaintiffs' members takes many forms. If the challenged rule takes effect on January 1, 2015, then home care companies will be required for the first time to make significant changes in their operations, client service, employment practices, compensation management, client relations, payer relations, referral

1

source relations, and the manner in which the business operate within the systems of support for persons in need of home care.  None of the costs associated with these drastic changes will be recoverable from any known source. 5. More specifically, home care business will suffer irreparable economic and significant noneconomic harm if the new definition of companionship services goes into effect on January 1, 2015.  This harm includes, but is not limited to:

a.) lost goodwill in the businesses' relationships with clients, client referral sources, government funding organizations, managed long term services and supports (MLTSS) organizations, health care providers in the continuum of care, and workers who provide personal care services in clients' homes as home care becomes a less reliable care and employment setting with higher costs, operational restrictions, barriers to access to care, increased inflexibility in service scheduling and caregiver assignment, compromised care quality, and care gaps;

b.) compromised business relationships with other stakeholders in home care that will consider the businesses to be unreliable or inconsistent sources of care;

c.) a shift in long term care policy under such state programs as Medicaid, the State Units on Aging, Centers for Independent Living, and veteran's programs that will no longer view home care as a viable and comprehensive care option for their constituents thereby leading to a shift towards institutional or congregate living care settings rather than an individuals' private home;

d.) business closures and lost revenues; and

e.) dramatic changes in business systems, structures, operations, human resource management, and focus triggered by the new definition of "companionship services" that cannot be easily or efficiently reversed in the event that the rule is ultimately determined to be invalid.

6. In part the foregoing irreparable harm inflicted by the new Section 552.6 will result from harms befalling Plaintiffs' members' elderly and infirm clients, which in turn will cause them to suffer declines in goodwill toward the caregiving employers who will no longer be able to fulfill the consumers needs at affordable costs.  In this regard, the new definition of companionship services" will:

a.) reduce care options for individuals in need of personal care and personal care supports. For example, home care consumers will no longer be able to receive continuous services from a single caregiver as working hours will be capped to control overtime compensation costs. In

addition, short term 24 hour respite care will be less available because of the inability of home care businesses to provide affordable care;

b.) create confusion and stress for consumers of home care as multiple, part-time caregivers replace full-time caregivers;

c.) increase the risk of quality of care shortcomings as worker turnover increases due to capped working hours leading to new, inexperienced workers;

d.) care will be acquired through "underground" services wherein consumers bypass care subject to quality and state regulatory controls and purchase care from unregulated, unsupervised individual caregivers;

e.) expand the waiting time to begin services as there will be increased difficulties in recruiting and training caregivers; and

f.) increase costs for care to a point where it will be unaffordable by some in need of home care. In turn, this will increase the risk of institutionalization of those individuals.

7. Home care workers will also be adversely affected, a fact that will again result in irreparable harm to Plaintiffs' member employers who rely on their home care workers to perform valuable caregiving services. The harm expected to be suffered by these workers includes, but is not limited to:

a.) reduced wages as working hours are capped by employers to avoid overtime costs;

b.) lost employment as the workforce is shifted to a part-time workforce, displacing those who want to need to work more than 40 hours per week:

c.) lost employment as the employer terminates operations because of an inability to adjust to the new compensation requirements:

      d.) lost opportunity to continue in a career as a caregiver as the level of available compensation is insufficient to meet the individual's cost of living; and

      e.) the need to take on multiple, part-time home care jobs to replace the work hours lost due to working hour caps imposed solely to control overtime costs.

8. The adverse impacts referenced above are already emerging, particularly in state Medicaid programs that are grappling with changes that are needed to avoid or reduce the financial impact of the new definition of "companionship service." Medicaid does not provide for coverage of the type of service that is considered "companionship services" under the new 29 CFR 552.6 as that new definition focuses on "fellowship." Instead, Medicaid programs provide coverage of beneficiaries who need personal care support in the home. See, 42 CFR Sections 440.70 (Home Health Services); 440.167 (Personal Care Services); 440.180 (Home and Community Based Waiver Services); 440.181 (Home and Community based Services for Individuals 65 and Over); and 440.182 (State Plan Home and Community Based Services). None of these Medicaid benefits cover "fellowship services" as defined in the new 29 CFR 552.6.

9. State Medicaid programs are in the midst of changes that will significantly modify their home care programs, affecting home care clients, workers, and businesses. These programs are looking at increasing payment rates as a last resort as state funds are not readily available to cover the new cost of overtime for personal care services that is outside the new definition of "companionship services." These programs do not provide coverage of fellowship services, the function that becomes the dominant (80%) element in the new definition of "companionship services." Concern about the impact of the new rule on Medicaid programs is highlighted by the recent joint letter from the U.S. Department of Justice and the Office of Civil Rights of the U.S. Department of Health and Human Services warning state Medicaid programs that the new rule may drive states to take steps that could violate the Americans with Disabilities Act (ADA). Currently, state Medicaid programs provide payment for personal care provided to an estimated 5 million Medicaid beneficiaries across the country under one or more of the programs referenced in paragraph 8.

10. In response to concerns raised by state Medicaid programs along with other government-based home care programs, the U.S. Department of Labor issued a policy action that provides for a time-limited (6 months at least) non-enforcement policy on the new rule. However, since that policy action does not affect the risk of private enforcement of the new rule, these programs are struggling for ways to comply, specifically for ways to avoid new costs. As a result, the impacts described in paragraphs 5, 6, and 7 are taking hold as January 1, 2015 approaches.

11. At this point, it is a rare Medicaid program that has instituted any adjustments to address or accommodate the cost of overtime compensation to personal care workers whose functions fit the current

definition of "companionship services," but will not fit the new definition that takes effect on January 1, 2015. The vast majority of Medicaid home care programs have taken no action that will allow employers of personal care aides to comply with the new overtime obligations that will be triggered by the new definition of "companionship services." If that new definition goes into effect on January 1, 2015, these employers will have virtually no other choice than to limit working hours of caregiver staff, restrict admissions of new clients and patients, or close down operations as the Department of Labor's policy action of a time-limited non-enforcement of the new rule still leaves these employers vulnerable to a private enforcement action.

11. With respect to services that are purchased by clients on a private pay or commercial insurance basis, home care companies already report that clients are terminating services rather than face higher charges for care, and employees are departing their employment in favor of other types of work rather than face new limits on hours worked.

12. The pace of changes outlined above is expected to accelerate after January 1, 2015 as more employers and payers recognize that the Department of Labor's temporary non-enforcement policy on the new rule provides no certain protection from overtime compensation obligations.

I hereby swear under penalties of perjury that the foregoing statement is true and accurate. Sworn to in Washington, D.C.

December 24, 2014

*[signature]*

William A. Dombi

Dated: December 24, 2014