**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOME CARE ASSOCIATION OF AMERICA, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:14-cv-00967 |
| | ) | |
| DAVID WEIL, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................ 2

BACKGROUND ................................................................................................................. 3

  I.   Statutory Background. ................................................................................................ 3

  II.   Regulatory History ................................................................................................ 5

    A.   1975 Regulation............................................................................................ 5

    B.   Application of the Fair Labor Standards Act to Domestic Service ............................ 7

  III.   Procedural Background. ...................................................................................... 15

STANDARD OF REVIEW ............................................................................................... 16

ARGUMENT ..................................................................................................................... 17

  I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR
    CLAIMS. ...................................................................................................................... 17

    A. The "Companionship Services" Regulation is Promulgated Pursuant to an Express
    Delegation of Statutory Authority, and is Entitled to *Chevron* Deference. ...................... 17

    B. Plaintiffs Fail to Raise Any Colorable Legal Challenge to the Department's Definition of
    Companionship Services............................................................................................... 22

  II. PLAINTIFFS CANNOT SATISFY THE IRREPARABLE HARM REQUIREMENT. ...... 30

    A. Plaintiffs' Tactical Decision to Delay Litigating Counts III and IV of Their Complaint
    Until Just the Week Before the Effective Date of the Rule Undercuts Any Claim of
    Irreparable Injury. ...................................................................................................... 30

    B. Plaintiffs Have Not Demonstrated Any Irreparable Harm That Might Warrant Injunctive
    Relief........................................................................................................................... 34

  III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN
    DEFENDANTS' FAVOR ............................................................................................. 39

    A. Home Care Workers Will Be Irreparably Harmed by a Preliminary Injunction and Will
    Never Be Able to Recover Wages for the Duration of the Injunction............................. 40

    B. The Progress that Has Been Made Toward Implementation Will Be Irreparably Harmed
    by a Preliminary Injunction. ...................................................................................... 42

CONCLUSION................................................................................................................... 43

# TABLE OF AUTHORTIES

## CASES                                                          PAGE(S)

*Abdullah v. Obama,*
 753 F.3d 193 (D.C. Cir. 2014) ............................................................................ 14

*Allied Local & Reg'l Mfrs. Caucus v. E.P.A.,*
 215 F.3d 61 (D.C. Cir. 2000) ............................................................................. 16

*Arnold v. Ben Kanowsky, Inc.,*
 361 U.S. 388 (1960) ........................................................................................... 19

*Bill Barrett Corp. v. U.S. Dep't of Interior,*
 601 F. Supp. 2d 331 (D.D.C. 2009) ......................................................... 31, 34, 36

*Brown v. D.C.,*
 888 F. Supp. 2d 28 (D.D.C. 2012) ...................................................................... 32

*Cannon v. Dist. of Columbia,*
 717 F.3d 200 (D.C. Cir. 2013) ............................................................................ 19

*Chaplaincy of Full Gospel Churches v. England,*
 454 F.3d 290 (D.C. Cir. 2006) ............................................................................ 14

*\*Chevron U.S.A., Inc., v. Natural Res. Def. Council, Inc.,*
 467 U.S. 837 (1984) .............................................................................. 15, 16, 26

*Clements v. Serco, Inc.,*
 530 F.3d 1224 (10th Cir.2008) ............................................................................ 19

*Cook v. Diana Hays & Options, Inc.,*
 212 F. App'x 295 (5th Cir. 2006) .......................................................................... 5

*Cox v. Acme Health Servs., Inc.,*
 55 F.3d 1304 (7th Cir. 1995) ................................................................................. 5

*CTS Corp. v. EPA,*
 --- F.3d ---, No. 12-1256, 2014 WL 3056493 (D.C. Cir. July 8, 2014) ...................... 37

*Del Monte Fresh Produce Co. v. U.S.,*
 570 F.3d 316 (D.C.Cir.2009) .............................................................................. 29

*Dennis v. Watco Cos.*,
631 F.3d 1303 (10th Cir. 2011) ...................................................................... 19

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
564 F.3d 688 (4th Cir. 2009) .......................................................................... 19

*Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.*,
254 F.3d 173 (D.C. Cir. 2001) ........................................................................ 23

*Fowler v. Incor*,
279 F. App'x 590 (10th Cir. 2008) .................................................................... 5

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ........................................................................ 28

*GEO Specialty Chemicals, Inc. v. Husisian*,
923 F. Supp. 2d 143 (D.D.C. 2013) ........................................................... 31, 34

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................................................ 31

*Greater New Orleans Fair Housing Action Center v. HUD*,
639 F.3d 1078 (D.C. Cir. 2011) ...................................................................... 14

*Havey v. Homebound Mortg., Inc.*,
547 F.3d 158 (2d Cir. 2008) ........................................................................... 19

*Hilbert v. D.C., a Mun. Corp.*,
23 F.3d 429 (D.C. Cir. 1994) .......................................................................... 19

*Indep. Bankers Ass'n v. Heimann*,
627 F.2d 486 (D.C. Cir. 1980) ........................................................................ 28

*La Botz v. Fed. Election Comm'n*,
No. CV 13-997 (RC), 2014 WL 3686764 (D.D.C. July 25, 2014) ...................... 29

*\*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ............................................................................. 3, 15, 25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................................................................................... 29

*Madden v. Lumber One Home Center, Inc.*,
745 F.3d 899 (8th Cir. 2014) .......................................................................... 19

*Mayo Found. for Med. Educ. & Research v. United States*,
   131 S. Ct. 704 (2011) ............................................................................ 16

*McCune v. Or. Senior Servs. Div.*,
   894 F.2d 1107 (9th Cir. 1990) ............................................................ 4, 5

*Minor v. Bostwick Labs, Inc.*,
   669 F.3d 428 (4th Cir. 2012) ................................................................ 26

*Munaf v. Green*,
   553 U.S. 674 (2008) ............................................................................... 14

*Mylan Pharm., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) .......................................................... 31

*National Telephone Co-op Ass'n. v. F.C.C.*,
   563 F.3d 536 (D.C. Cir. 2009) .............................................................. 25

*Nat'l Ass'n of Clean Air Agencies v. E.P.A.*,
   489 F.3d 1221 (D.C. Cir. 2007) ............................................................ 16

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) ........................................................ 34

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ...................................................... 27

*Nken v. Holder*,
   129 S. Ct. 1749 (2009) ........................................................................... 36

*\*NRDC v. Pena*,
   147 F.3d 1012 (D.C. Cir. 1998) ...................................................... 27, 30

*Overnight Motor Transp. Co. v. Missel*,
   316 U.S. 572 (1942) .................................................................. 26, 36, 40

*Reich v. Gateway Press, Inc.*,
   13 F.3d 685 (3d Cir. 1994) .................................................................... 19

*Safari Club Int'l v. Jewell*,
   No. CV 14-0670 (ABJ), 2014 WL 2535948 (D.D.C. June 6, 2014) ...... 33

*Sai v. Transportation Security Admin.*,
   --- F. Supp. 2d ---, 2014 WL 3029217  (D.D.C. July 7, 2014)............... 25

*Salyer v. Ohio Bureau of Workers' Comp.*,
  83 F.3d 784 (6th Cir. 1996) ................................................................. 4

*Schweiker v. Chilicky*,
  487 U.S. 412 (1988)......................................................................... 26

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ............................................................ 15

*Sinclair National Bank v. Office of the Comptroller of the Currency*,
  No. 00-2398, 2000 WL 34012862 (D.D.C. Dec. 18, 2000)......................... 32

*Spinden v. GS Roofing Prods. Co.*,
  94 F.3d 421 (8th Cir.1996) ................................................................ 19

*United States v. Mead Corp.*,
  533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).......................... 16

*University of Texas M.D. Anderson Cancer Center v. Sebelius*,
  650 F.3d 685 (D.C. Cir. 2011) ............................................................ 26

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).......................................................................... 36

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008).............................................................................. 14

*\*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)...................................................... passim

## STATUTES

29 U.S.C. § 213(a)(15)................................................................ 3, 15, 26
29 U.S.C. § 216.............................................................................. 29
29 U.S.C. § 216(b)....................................................................... 29, 28
29 U.S.C. § 216(c) ........................................................................... 28
29 U.S.C. § 206............................................................................. 2, 16
29 U.S.C. § 206(f)............................................................................... 2
29 U.S.C. § 207............................................................................. 2, 16
29 U.S.C. § 207(l).............................................................................. 2

## REGULATIONS

29 C.F.R. § 552.109 ................................................................. 13, 26, 30
29 C.F.R. § 552.109(a)...................................................................... 30
29 C.F.R. § 552.6 ....................................................................... passim

29 C.F.R. § 552.6(a)...................................................................... 9, 20, 22

29 C.F.R. § 552.6(a)-(d) ...................................................................... 10

29 C.F.R. § 552.6(b) .................................................................... passim

29 C.F.R. § 552.6(c) ........................................................................... 12

29 C.F.R. § 552.6(d) ............................................................................. 7

29 C.F.R. part 552 ............................................................................ 4, 7

## **RULES**

39 Fed Reg. 35,385 ............................................................................. 17

40 Fed. Reg. 7,404 (Feb. 20, 1975) ..................................................... 4

40 Fed. Reg. 7,405 ............................................................................... 8

60 Fed. Reg. 46,797 ........................................................................... 29

67 Fed. Reg. 16,668 ........................................................................... 26

76 Fed. Reg. 81,190 (Dec. 27, 2011) ................................................... 7

77 Fed. Reg. 11,021 (Feb. 24, 2012) ................................................... 8

77 Fed. Reg. 14,688 (March 13, 2012) ................................................. 8

78 Fed. Reg. 60, 458-59 ..................................................... 6, 16, 18, 23

78 Fed. Reg. 60,4548 ................................................................... passim

79 Fed. Reg. 60,974 ........................................................................... 38

## INTRODUCTION

Under an express grant of statutory authority, the Department defined "companionship services," a term that appears in an exemption from the Fair Labor Standards Act, to focus the term's scope on elder sitting, the type of services to which Congress intended it to apply. In fact, this Court has recognized in this case that "[t]he Department, appropriately, has filled those [statutory] gaps through regulations, including revised definitions for . . . 'companionship services.'" Memorandum Opinion, ECF No. 21, at 11-12. Thus, the Department's regulation is entitled to *Chevron* deference, and the Court must defer to it as long as it is "reasonable." The Department easily meets this standard: the text of the FLSA, and the legislative history of the 1974 Amendments support the Department's regulation, and the new definition serves the important public policy goal of providing minimum wage and overtime compensation protections to domestic service workers who provide home care services, and for whom this work is a "vocation." Accordingly, the Court must deny plaintiffs' request for a preliminary injunction, on the ground that they cannot demonstrate a likelihood of success on the merits.

Plaintiffs also fail to meet any of the remaining factors for injunctive relief. Plaintiffs' last-second request for emergency relief from a rule which was published over a year ago, and which plaintiffs challenged in their months-old complaint, should be denied because there is no emergency justifying preliminary injunctive relief, and such unreasonable delay is reason enough to deny plaintiffs' motion. Plaintiffs' implausible excuse that they did not think they had standing to seek relief on half of the claims in their complaint until six months after they filed suit cannot justify their egregious delay. Indeed, if this excuse were plausible, plaintiffs' lack of standing to seek relief on these claims would have required the Court to dismiss them for lack of

subject matter jurisdiction.  Further, plaintiffs' choice to litigate this case on this timetable, in and of itself, undercuts their ability to show irreparable harm.

Moreover, Plaintiffs' conclusory declarations do not meet their heavy burden of proving the necessity of injunctive relief, nor do plaintiffs come close to showing that they will face any certain and irreparable harm beyond having to pay their employees minimum wage and overtime compensation, and such monetary harm cannot justify injunctive relief.  On balance, the harms to the public far outweigh any harm plaintiffs could show.  Individual states' efforts to adjust to the new rule, which are still in progress, would be disrupted by a stay of the effective date of the companionship services definition to the detriment of workers, recipients of services and the public interest.

On December 31, 2014, this Court granted a temporary restraining order and stayed the Rule's effective date until January 15, 2015.  *See* Order, ECF No. 26.  Having considered defendants' opposition, the Court should deny plaintiffs' request for a preliminary injunction, because plaintiffs cannot meet the high bar for demonstrating the necessity of such relief.

## BACKGROUND

### I.     Statutory Background.

The Fair Labor Standards Act ("FLSA") requires that covered employers pay non-exempt employees in compliance with its minimum wage and overtime compensation requirements.  29 U.S.C. §§ 206, 207.  In 1974, Congress amended the statute to apply broadly to "domestic service" employees.  Fair Labor Standards Act Amendments of 1974, Pub. Law 93-259, §§ 7(b)(1), (2), 88 Stat.55, 62 (1974) (codified in relevant part at 29 U.S.C. §§ 206(f), 207(l)) ("1974 Amendments").  The purpose of this change was to "not only raise the wage of these workers but … improve the sorry image of household employment. … Including domestic

workers under the protection of the Act should help to raise the status and dignity of this work." House Report No. 93-913, pp. 33-34 (1974).

In extending the application of the FLSA's fundamental protections to domestic service employees, Congress created, at 29 U.S.C. § 213(a)(15), an exemption for "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15).[1] The Supreme Court has recognized the Department's authority to define these terms. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (explaining that "the FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services'" and that the statute "provides the Department with the power to fill these gaps through rules and regulations" (citing 29 U.S.C. 213(a)(15); 1974 Amendments, § 29(b), 88 Stat. at 76)). This Court has as well. Memorandum Opinion ("Mem. Op."), ECF No. 21 at 11-12 (explaining that "[t]he Department, appropriately, has filled those [statutory] gaps through regulations, including revised definitions for 'domestic service employment' and 'companionship services' in the new rule scheduled to go into effect January 1, 2015").

The legislative history of section 213(a)(15) provides some context for Congress' intent in creating the babysitting and companionship services exemptions. Specifically, the House and Senate Reports on the 1974 Amendments explain that "[i]t is the intent of the committee to

---

[1] The 1974 Amendments also gave the Secretary broad general authority to prescribe "rules, regulations, and orders" implementing the Amendments. 1974 Amendments, § 29(b), 88 Stat. at 76.

include within the coverage of the Act all employees whose vocation is domestic service. …

People who will be employed in the excluded categories are not regular bread-winners or

responsible for their families' support."  House Report No. 93-913, p. 36; Senate Report No. 93-

690, p. 20.  Furthermore, the Congressional Record reflects that the companionship services

exemption was meant to apply to "elder sitters" whose primary responsibility was "to be there

and to watch" over an elderly person, or a person with an illness, injury, or disability in the same

manner that a babysitter watches over children.  119 Cong. Rec. S24773, S24801 (daily ed. July

19, 1973) (statement of Sen. Williams).

## II.    Regulatory History

### A.  1975 Regulation

In 1975, the Department exercised its authority under the 1974 Amendments to, among

other things, promulgate a regulatory definition of "companionship services." 40 Fed. Reg. 7,404

(Feb. 20, 1975) (creating 29 C.F.R. part 552).  The 1975 regulation defined the term

"companionship services" as "those services which provide fellowship, care, and protection for a

person who, because of advanced age or physical or mental infirmity, cannot care for his or her

own needs."  40 Fed. Reg. 7,405 (codified at 29 C.F.R. § 552.6).  The definition specified that

the services "may include household work related to the care of the aged or infirm person such as

meal preparation, bed making, washing of clothes, and other similar services," and that it "may

also include the performance of general household work," although such work must "not exceed

20 percent of the total weekly hours worked."  *Id*.  The term "does not include services relating

to the care and protection of the aged or infirm which require and are performed by trained

personnel, such as a registered or practical nurse."  *Id*.

As the home care industry has expanded over time, courts have interpreted this regulatory definition broadly. *See, e.g.*, *Salyer v. Ohio Bureau of Workers' Comp.*, 83 F.3d 784, 787 (6th Cir. 1996) (worker who "helps [an adult with a serious back injury] dress, gives him his medication, helps him bathe, assists him in getting around their home, and cleans his bedclothes when he loses control of his bowels" is providing companionship services); *McCune v. Or. Senior Servs. Div.*, 894 F.2d 1107, 1108–09 (9th Cir. 1990) ("full-time, live-in attendants for elderly and infirm individuals unable to care for themselves" who perform "cleaning, cooking, and hygiene and medical care" for those individuals were providing companionship services because under the current regulation, "the recipients of these services [are] the determinative factor in applying the [companionship services] exception"); *Fowler v. Incor*, 279 F. App'x 590, 596 (10th Cir. 2008) (noting that definition of companionship services "has been expanded to include more frequent vacuuming and dusting for a client with allergies, mopping and sweeping for clients who crawl on the floor, and habilitation training, which often includes training the client to do housework, cooking, and attending to personal hygiene"); *Cook v. Diana Hays & Options, Inc.*, 212 F. App'x 295, 296–97 (5th Cir. 2006) (direct care worker "employed by . . . a non-profit corporation that provides home health care" who "provided simple physical therapy, prepared [consumers'] meals, assisted with [consumers'] eating, baths, bed-making, and teeth brushing, completed housework . . . and accompanied them on walks, to doctor visits, to Mass, and to the grocery store" was exempt).

Furthermore, courts have narrowly construed the regulation's exclusion of "trained personnel" from companionship services such that home care workers providing medical care, including certified nursing assistants and often home health aides, are not protected by the FLSA. *See, e.g., McCune*, 894 F.2d at 1110-11 (certified nursing assistants were not "trained personnel"

excluded from the regulatory definition of companionship services); *Cox v. Acme Health Servs., Inc.*, 55 F.3d 1304, 1307-10 & n. 6 (7th Cir. 1995) (holding that a home health aide who had completed 75 hours of required training and "perform[ed] patient care" including "administering complete bed baths, positioning and turning patients in bed, tube-feeding, the taking and recording of vital signs, bowel and bladder training, changing and cleaning patients' catheters, administering enemas, range-of-motion exercise training, speech training, and inserting non-medicated suppositories" did not qualify as "trained personnel" and therefore provided "companionship services").

### B. Application of the Fair Labor Standards Act to Domestic Service

### i. Notice of Proposed Rulemaking

Because of this broad reading of the 1975 regulatory language and the significant expansion of the home care industry and workforce—which neither Congress nor the Department could have foreseen in the 1970s—today, most home care workers are not entitled to minimum wage and overtime protections. Application of the Fair Labor Standards Act to Domestic Service, Final Rule, 78 Fed. Reg. 60,454, 60,458-59 (Oct. 1, 2013). The home care industry has changed dramatically since the 1970s, when "individuals with significant care needs were served in institutional settings rather than in their homes and [] communities." *Id*. at 60,455. Since that time, the demand for long-term, in-home care for seniors and individuals with disabilities has risen dramatically, in part because federal Medicaid funding can be used to pay for personal care services, reflecting that "our nation has come to recognize the importance of providing services in private homes and other community-based settings and of supporting individuals in remaining in their homes and communities." *Id*. at 60,458. The dramatic increase in the number of home care agencies and workers employed in the United States—to over 10,500

agencies in 2009 and nearly two million workers in 2011—reflects the scope of an industry that was not contemplated in the drafting of the 1975 regulations.  *Id*.  As the industry has expanded, the workers who provide home care have come to perform increasingly skilled duties; most of these workers are not the "elder sitters" that Congress envisioned when it enacted the companionship services exemption in 1974, but are instead professional caregivers.  *Id*.  These professionalized workers have nevertheless been excluded from the minimum wage and overtime protections of the FLSA under the companionship services exemption, resulting in their earnings "remain[ing] among the lowest in the service industry, [which] imped[es] efforts to improve both jobs and care."  *Id*.

The Department engaged in the rulemaking at issue in this case to realign the scope of the companionship services exemption with Congress' intent when it extended FLSA protections to domestic service employees in 1974.  *Id*.  On December 27, 2011, the Department issued a Notice of Proposed Rulemaking ("NPRM") in which it proposed various changes to the domestic service employment regulations at 29 C.F.R. Part 552.  Application of the Fair Labor Standards Act to Domestic Service, Proposed Rule, 76 Fed. Reg. 81,190 (Dec. 27, 2011).  Relevant here is the Department's proposal to update the definition of "companionship services" at 29 C.F.R. § 552.6.  The NPRM contained a four-paragraph definition of the term intended to be more

limited than the 1975 regulatory definition such that only "elder sitters," rather than nearly all home care workers, would fall within it.[2]

The NPRM explained the Department's rationale for the new definition. In particular, the Department discussed the relevant legislative history, quoting from the Congressional Record and House Report regarding the 1974 Amendments and explaining that the documents "indicate[] that Congress intended to remove from minimum wage and overtime protection only those domestic service workers for whom domestic service was not their vocation and whose actual purpose was to provide casual babysitting or companionship services." *Id*. at 81,193.[3] The Department explicitly sought comment as to whether the list of activities in proposed paragraph (b) should be modified, whether the 20 percent limitation on those activities was appropriate, and whether the description of medically related tasks in proposed paragraph (d)

_____

[2] Specifically, paragraph (a) of the proposed regulatory provision defined "companionship services" as "those services which provide fellowship and protection"; paragraph (b) listed and described seven types of "intimate personal care services" that could be part of companionship services if they were "incidental" to the provision of fellowship and protection and did not exceed 20 percent of the employee's work time; paragraph (c) excluded from companionship services household work benefitting members of the household other than the person receiving fellowship, protection, and personal care services; and paragraph (d) excluded medical care from companionship services. The full text can be found at: 76 Fed. Reg. 81,192-95, 81,244 (proposing codification at 29 C.F.R. § 552.6(a)-(d)).

[3] The Department also considered the dictionary definitions of "companionship," "companion," and "fellowship," concluding that the terms are "instructive" in concluding that Congress' intent was that the exemption refer to "someone in the home primarily to watch over and care for the elderly or infirm person." *Id*. And the Department described another way the 1975 definition was problematically broad: because it included providing household work for the individual in need of care and as much as 20 percent of work time providing general household work, it was possible for an employee to be covered by the exemption despite the fact that she was primarily performing domestic services that are plainly meant to be covered, such as the work of a maid or cook, and was only incidentally providing fellowship and protection. *Id*.

appropriately reflected the medical work of home health aides and personal care aides. *Id.* at

81,195.[4]  It ultimately received more than 26,000 comments regarding the NPRM.  See 78 Fed.

Reg. 60,460.

### ii.  Final Rule

On October 1, 2013, the Department published a Final Rule adopting the changes

proposed in the NPRM, with modifications in response to comments.  78 Fed. Reg. 60,454-557.[5]

In the section of the preamble most relevant here, the Department explained that it was

promulgating a revised definition of companionship services, 29 C.F.R. § 552.6, similar to but

somewhat different from the proposed text.  The final adopted regulatory definition defines

"companionship services" as "the provision of fellowship and protection for an elderly person or

person with an illness, injury, or disability who requires assistance in caring for himself or

---

[4] The Department allowed 60 days, until February 27, 2012, for public comment on the NPRM. 76 Fed. Reg. 81,190.  In an effort to collect extensive public input, the Department twice extended the time during which it would accept comments.  Notice and Extension of Comment Period, 77 Fed. Reg. 11,021 (Feb. 24, 2012) (extending the time for comments until March 12, 2012); Extension of comment period, 77 Fed. Reg. 14,688 (March 13, 2012) (extending the time for comments until March 21, 2012).

[5] Consistent with legal requirements, the Department's general practice for promulgating regulations, and the Department's interest in providing useful guidance to the regulated community, the Final Rule: summarized the Department's intent in conducting rulemaking as well as the particular regulatory amendments made; described in detail all changes to the domestic service employment regulations, summarized comments it received about each change, and explained the rationale for each change; provided a comprehensive summary of FLSA principles unchanged by the Final Rule but newly relevant in the home care context; contained an extensive analysis of the economic impact of the rulemaking; confirmed that the Rule conformed to various Executive Orders and other legal requirements for rulemaking; and set forth the amended regulatory text.  78 Fed. Reg. 60,454-557.  A list of documents in the rulemaking record is attached to this opposition as Exhibit 1.

herself."[6]  29 C.F.R. § 552.6(a) (as amended).  The Department also included in the scope of the

term "the provision of care if the care is provided attendant to and in conjunction with the

provision of fellowship and protection and if it does not exceed 20 percent of the total hours

worked per person and per workweek."[7]  29 C.F.R. § 552.6(b).  The definition excludes

"domestic services performed primarily for the benefit of other members of the household," 29

C.F.R. § 552.6(c), and "the performance of medically related services provided for the person,"

29 C.F.R. § 552.6(d).  The definition explains that "whether services are medically related is

based on whether the services typically require and are performed by trained personnel, such as

registered nurses, licensed practical nurses, or certified nursing assistants; the determination is

not based on the actual training or occupational title of the individual performing the services."

*Id.*

    The Department provided a thorough explanation of its rationale for adopting this

definition.  First, the Department explained that the 1975 regulation "was written at a time when

---

[6] The provision of fellowship "means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events."  78 Fed. Reg. 60,557 (to be codified at 29 C.F.R. § 552.6(a)).  The provision of protection "means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being."  *Id.*

[7] The provision of care "means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care)."  78 Fed. Reg. 60,557 (to be codified at 29 C.F.R. § 552.6(b)).

the scope of direct care work was much more limited and neither Congress nor the Department predicted the developments in home care services that were to come." *Id*. at 60,459. The developments in home care noted in the NPRM—the increased focus on allowing elderly people and individuals with disabilities to live in their homes and communities rather than in institutions, and the resulting expansion of the home care industry, including the number of workers and types of services provided outside of institutional settings—compelled the Department to update the definition of "companionship services" to exclude the many workers whose vocation is home care. *Id*. Furthermore, the Department noted that it had taken into account the comments received expressing concern about the effects of the Rule on individuals who rely on home care services; the Department did not believe the Rule would lead to increased institutionalization and explained that guaranteeing FLSA protections to home care workers would benefit recipients of services "because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a high quality of care." *Id*. at 60,459-60.

The preamble next discussed in detail each paragraph of the final definition, beginning with paragraph (a), which provides that companionship services means the provision of "fellowship" and "protection" and describes the meaning of those two words. The preamble summarized many supportive comments, as well as those that raised concerns about the proposed change, reiterated the reasoning it explained in the NPRM, and summarized the dictionary definitions of the relevant terms. 78 Fed. Reg. 60,463. It then explained that after considering these comments and factors, the Department was adopting paragraph (a) essentially as proposed, with minor, non-substantive modifications. *Id*.

Next, the Department explained its rationale for the various decisions it made in

promulgating 29 C.F.R. § 552.6(b), which, as adopted, makes a limited amount of "care,"

defined as assistance with "activities of daily living" (ADLs) and "instrumental activities of daily

living" (IADLs), part of companionship services.  As a preliminary matter, the preamble noted

that the purpose of paragraph (b) of the definition of companionship services—"to define certain

services that, if provided to a limited extent and incidentally to the fellowship and protection that

are the core duties of an exempt companion, do not defeat the exemption"—was the same in the

Final Rule as in the NPRM, but the Department had made changes from the proposed language

to make the provision "easier for the regulated community to understand."  78 Fed. Reg. 60,464.

The Department explained that it had abandoned the list of "intimate personal care services"

included in the NPRM in favor of using the terms ADLs and IADLs, language many comments

made clear was familiar and meaningful to the regulated community.  *Id.* at 60,465-66.[8]  The

Department also considered comments regarding the limitation on the services described in

paragraph (b) to 20 percent of an employee's hours worked in a workweek, which included

suggestions to raise, lower, or amend the method of calculating that limit.  *Id*. at 60,467.  The

Department adopted this portion of the regulatory provision essentially as proposed, explaining

that a limit was necessary to keep the definition of companionship services consistent with the

---

[8] The Department also responded to comments regarding the incorporation of "care" in the definition of companionship services, noting that although "care" is not mentioned in paragraph (a), paragraph (b) makes "care" part of the meaning of the term.  78 Fed. Reg. 60,465.  To better emphasize this point, the Department modified paragraph (b) to "use[] the term 'care' rather than 'intimate personal care services.'"  *Id.*

view, adopted from the legislative history of the 1974 amendments, that "companionship services" primarily means watching over a person, while allowing some tolerance for additional services because doing so was "necessary as a matter of practicality."  *Id.*  The selection of a 20 percent limit was based on historical practice and thus the familiarity of the regulated community with this type of threshold.  *Id.* at 60,468, 60,469 (citing other FLSA regulations containing a 20 percent limit).

Regarding 29 C.F.R. § 552.6(c), which excludes general household work from the definition of companionship services, the Department explained that it was adopting a simplified version of the proposed text.  78 Fed. Reg. 60,469.  Specifically, paragraph (c) as adopted excludes "domestic services performed primarily for the benefit of other members of the household."  *Id.*[9]

Turning to paragraph (d), which addresses the exclusion of medical services from the definition of companionship services, the Department explained that as to this provision, too, it was adopting regulatory text in keeping with its purpose in the NPRM but modified for simplicity and clarity in light of comments received.  78 Fed. Reg. 60,469.  The Department noted that the adopted text of paragraph (d) was different than the 1975 regulation's treatment of medical care in two significant ways.  *Id.* at 60,470.  First, it adds certified nursing assistants

---

[9] To explain the meaning of this provision and in response to questions posed in comments to the NPRM, the Department explained that the language was meant to limit "companionship services" to services provided to the elderly person or person with an illness, injury, or disability.  *Id.*  This limit is consistent with the 1974 Amendment's extension of FLSA protections to domestic service workers acting as, for example, maids or cooks—i.e., workers providing general household services.  *Id.*

("CNAs") to the list of occupations the practitioners of which are considered "trained personnel" whose services do not constitute companionship services. *Id.*[10] Second, it makes explicit that if a worker performs the services typically provided by trained personnel, her work does not fall within the definition of companionship services even if she has not received the training or licensing usually required of such personnel. *Id.*[11]

### III. Procedural Background.

On June 6, 2014, the Home Care Association of America, International Franchise Association and National Association for Home Care & Hospice ("plaintiffs") filed this action against defendants David Weil, in his official capacity as Administrator of the Wage & Hour Division of the Department of Labor, Thomas E. Perez, in his official capacity as the Secretary of Labor, and the United States Department of Labor ("Department") challenging the Final Rule.

---

[10] This first change, the Department explained, was based on the legislative history of the companionship services exemption and the work CNAs perform. 78 Fed. Reg. 60,471. Specifically, the Department understands the statement in the House and Senate Reports regarding the 1974 Amendments that "'it is not intended that trained personnel such as nurses, whether registered or practical, shall be excluded from the protections of the FLSA under the companionship services exemption'" to mean that RNs and LPNs are examples, not the exclusive list of, trained personnel whose work is entitled to minimum wage and overtime protections. *Id.* (quoting House Report No. 93-913, p. 36; Senate Report No. 93-690, p. 20). Furthermore, various facts about the training and work of CNAs demonstrate that they are appropriately categorized with RNs and LPNs for this purpose: federal law dating from the 1980s requires that CNAs receive certain amounts and types of training; typical core duties of CNAs, such as administering medications or treatments, are professional and skilled; and the current work of CNAs is similar to or more technical than typical duties performed by LPNs in the 1970s. *Id.* at 60,471-72.

[11] As to this second change, making explicit that any worker performing the typical duties of an registered nurse, licensed practical nurse or CNA is not performing companionship services regardless of the worker's actual training or licensing, the Department explained that as a general matter, work performed, rather than job title, is significant for purposes of analyzing the applicability of the FLSA. 78 Fed. Reg. 60,472. Furthermore, regardless of whether a worker has the proper training and credentials to perform medically related duties, those duties are skilled, professional work that does not fall within the meaning of "companionship services." *Id.*

Plaintiffs' counsel requested that the parties brief Counts I and II of plaintiffs' complaint—challenging the third party employer regulation, 29 C.F.R. § 552.109—on an expedited schedule to allow the Court time to decide these issues before the rule's effective date of January 1, 2015. The parties submitted a joint briefing schedule, indicating that plaintiffs were "seeking declaratory and injunctive relief on an expedited basis" and that plaintiffs "believe[d] that expedited briefing is necessary to give the Court sufficient time to review the issues and render a decision prior to" the rule's effective date. ECF No. 6. Defendants did not oppose the expedited briefing schedule, and the Court entered an order adopting it on July 22, 2014.

In accordance with the schedule, the parties submitted cross-motions for summary judgment; briefing concluded on September 9, 2014. *See* ECF Nos. 9,13,15,18. The Court heard oral argument in this case on November 19, 2014, and on December 22, 2014, the Court issued its decision granting summary judgment on Counts I and II of the complaint in favor of plaintiffs. Mem. Op., ECF No. 21; Order, ECF No. 22. On December 31, 2014, the Court issued a temporary restraining order staying the effective date of the revisions to 29 U.S.C. § 552.6 to January 15, 2015. ECF No. 26.

## **STANDARD OF REVIEW**

A preliminary injunction is an "extraordinary remedy," which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20; *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). Two of these factors are of particular importance. "In ruling on a preliminary injunction a key issue—often

15

the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans Fair Housing Action Center v. HUD*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) (citing *Munaf v. Green*, 553 U.S. 674, 690 (2008)). Moreover, "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ARGUMENT

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A. The "Companionship Services" Regulation was Promulgated Pursuant to an Express Delegation of Statutory Authority, and is Entitled to *Chevron* Deference.

Because section 213(a)(15) explicitly grants authority to the Department to define and delimit the term "companionship services," and the agency did so reasonably and through a robust notice-and-comment rulemaking process, the Court must defer to the agency's reasonable interpretation of the statute; plaintiffs, therefore, cannot show any likelihood of success on the merits of their claim. *See Sherley v. Sebelius*, 644 F.3d 388, 389, 395–98 (D.C. Cir. 2011) (vacating the district court's imposition of a preliminary injunction because plaintiffs were unlikely to prevail given the ambiguity of the statute and the agency's reasonable interpretation).

Where, as here, "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). As this Court found in its December 22, 2014 Memorandum Opinion, "[t]he companionship services exemption itself directs the Secretary of Labor to 'define[] and delimit[]'

16

the statutory terms in the exemption, 29 U.S.C. § 213(a)(15)." Mem. Op. at 11; *see also Coke*, 551 U.S. at 165 ("[T]he FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as . . . 'companionship services.'").

This express delegation of authority "provides the Department with the power to fill these gaps through rules and regulations." *Coke*, 551 U.S. at 165. It is under this Congressional delegation of authority that the Department engaged in notice-and-comment rulemaking and issued a regulation defining "companionship services" so that it describes the type of "elder sitting" Congress intended to exempt from the FLSA's minimum wage and overtime protections. 78 Fed. Reg. 60, 458-59; 29 C.F.R. § 552.6 (as amended). Such "legislative regulations" must be upheld "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *see also United States v. Mead Corp*., 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (when an agency fills a statutory gap reasonably, and in accordance with procedural requirements, courts accept the result as legally binding). The arbitrary and capricious standard is "highly deferential," and it "presumes the validity of agency action." *Nat'l Ass'n of Clean Air Agencies v. E.P.A*., 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation and internal quotations omitted). Moreover, that the Department engaged in a thorough and proper notice-and-comment rulemaking—and plaintiffs do not dispute this fact—counsels in favor of this Court showing the regulation the highest degree of deference. *See, e.g.*, *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 714 (2011) ("The Department issued the [] rule only after notice-and-comment procedures . . . again a consideration identified in our precedents as a 'significant' sign that a rule merits *Chevron* deference.") (quoting *Mead*, 533 U.S. at 230-31). This Court must "uphold [the Department's] action," because "[the Department] has considered the relevant factors and articulated a 'rational connection between

the facts found and the choice made.'" *Id.* (quoting *Allied Local & Reg'l Mfrs. Caucus v. E.P.A.*, 215 F.3d 61, 68 (D.C. Cir. 2000).

The Department's definition of "companionship services" is reasonable—and therefore the Court must defer to it, *see Chevron*, 467 U.S. at 843-44—because the language of the FLSA itself supports the Department's definition. The FLSA directs *all* employers to pay overtime and minimum wage unless an exemption applies. *See* 29 U.S.C. §§ 206, 207. In fact, Congress amended the FLSA in 1974 in an effort to extend minimum wage and overtime protections to *all domestic service workers*, including those employed by private households or companies too small to be covered by the Act.[12] *See* Fair Labor Standards Amendments of 1974, Public Law 93-259 Sec. 7, 88 Stat. 55, 62 (1974); *see also* 119 Cong. Rec. at S24800 ("Coverage of domestic employees is a vital step in the direction of insuring that all workers affecting interstate commerce are protected by the Fair Labor Standards Act."); Senate Report No. 93-690 at p. 20 ("The goal of the Amendments embodied in the committee bill is to update the level of the minimum wage and . . . to extend the basic protection of the Fair Labor Standards Act to additional workers and to reduce to the extent practicable at this time the remaining exemptions."). With these 1974 Amendments, Congress sought to "include within the coverage

_____

[12] Before 1974, the FLSA's minimum wage and overtime protections only covered domestic service workers if they worked for an agency or business large enough to be subject to the FLSA, or if they were themselves engaged in interstate commerce. *See* Fair Labor Standards Amendments of 1974, Pub. Law 93-259, §§ 7(b)(1), (2), 88 Stat.55, 62 (1974); *see also* 78 Fed. Reg. 60,457. For example, prior to 1974, domestic service employees who worked for a placement agency that met the annual earnings threshold for FLSA enterprise coverage, but were assigned to work in someone's home, were covered by the FLSA. 39 Fed Reg. 35,385. But all other domestic service workers who worked directly for a private household, such as housekeepers, butlers, nannies, cooks, and chauffeurs were not covered by the FLSA.

of the Act *all* employees whose vocation is domestic service," but to exclude from coverage people who "are not regular bread-winners or responsible for their families' support." *Id.* (emphasis added); House Report No. 93-913, p. 36 (1974).  Congress further indicated that these amendments were intended to "raise the wages of these workers . . . [and] help to raise the status and dignity of this work." *Id*. at pp. 33-34.

Simultaneous with this expansion of coverage for domestic service workers, Congress enacted the companionship services exemption, which was meant to apply to "elder sitters" whose primary responsibility was "to be there and to watch" over an elderly person, or a person with an illness, injury, or disability in the same manner that a babysitter watches over children, not to workers who perform "household work."  119 Cong. Rec. S24801 (statement of Sen. Williams).  The companionship services exemption was not intended to exclude from the Act's protections "trained personnel such as nurses, whether registered or practical."  *See* Senate Report No. 93-690, 93rd Cong., 2d Sess., p. 20 (1974).

Since Congress amended the FLSA, the home care industry has grown significantly.  For example, the number of Medicare-certified home care agencies increased by almost 500 percent from 1975 to the end of 2009.  *See* 78 Fed. Reg. 60,458, citing The National Association for Home Care & Hospice, *Basic Statistics About Homecare: Updated 2010* (2010), available at http://www.nahc.org/assets/1/7/10HC_Stats.pdf.  Moreover, the duties performed by home care workers have become increasingly skilled and professionalized.  78 Fed. Reg. 60,458.  Despite these dramatic changes, the vast majority of home care workers still fall within the companionship services exemption that was intended to apply only to "elder sitters."  Indeed, home care workers today work, on average, 34 hours per week, s*ee* Seavey, Dorie, et al., Caring in America: A Comprehensive Analysis of the Nation's Fastest-Growing Jobs: Home Health and

Personal Care Aides, Dec. 2011 at 63 ("PHI Report") (attached as Exhibit 2), indicating that home care work is a "vocation" for these workers, *see* 88 Stat. 55, 62; *see also* 78 Fed. Reg. 60,522, citing PHI Report at 61-64. Although for many this work is a primary means of supporting their families, average wages for home care workers are below $10 per hour and approximately half of home care workers live in households that receive public benefits, such as food stamps or Medicaid. *See* PHI Report at 52-53, 57-58.

The Department therefore sought to realign the definition of "companionship services" to apply to "elder sitters" for whom providing companionship is not a vocation, as Congress intended when it expanded the FLSA's protections to domestic service workers and created the narrow companionship services exemption. By narrowing this exemption, the Department extended the minimum wage and overtime protections of the FLSA to those workers for whom home care is a profession. Plaintiffs incorrectly claim that the new definition effectively repeals the exemption; the Final Rule merely narrows the exemption's scope to cover the type of elder sitting that Congress intended in light of the undue expansion of the companionship services exemption due to changed circumstances neither Congress nor the Department could have foreseen. 78 Fed. Reg. 60,458; *cf. Hilbert v. D.C., a Mun. Corp.,* 23 F.3d 429, 439 (D.C. Cir. 1994) ("[A] court's creativity should be tempered by the general rule that exemptions from the FLSA requirements are to be narrowly construed to fulfill Congress' purpose of providing broad federal employment protection."); *Cannon v. Dist. of Columbia*, 717 F.3d 200, 204 (D.C. Cir. 2013) (noting that FLSA "exemptions are 'narrowly construed'") (quoting *Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir. 2008)); *see also, e.g., Madden v. Lumber One Home Center, Inc.*, 745 F.3d 899, 903 (8th Cir. 2014) ("Exemptions to the FLSA are narrowly construed to protect workers.") (citing *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th

Cir.1996)); *Dennis v. Watco Cos.*, 631 F.3d 1303, 1306 (10th Cir. 2011) ("In applying the FLSA we are guided by the principle[] that exemptions to the FLSA are to be narrowly construed.") (citing *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir.2008)); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 692 (4th Cir. 2009) ("FLSA exemptions are to be 'narrowly construed against the employers seeking to assert them.'") (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 694 (3d Cir. 1994) ("[B]ecause the FLSA is a remedial statute, the Supreme Court has long held that exemptions from the FLSA are to be narrowly construed against the employer.") (citing *Ben Kanowsky, Inc.*, 361 U.S. at 392). The Department therefore acted well within its delegated authority in defining "companionship services" to narrow the exemption to apply to "elder sitters" rather than professional home care workers for whom this work is a vocation. As the Supreme Court held, "Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Coke*, 551 U.S. at 167-68.

### B. Plaintiffs Fail to Raise Any Colorable Legal Challenge to the Department's Definition of Companionship Services.

In their motion, plaintiffs point to *no* statutory language—nor could they—that conflicts with the Department's definition of "companionship services." Plaintiffs' argument that "care" is no longer a "core purpose" of the exemption is belied by the text of the regulation. The new definition of "companionship services" includes "fellowship"—meaning "to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events"—and "protection"—meaning "be[ing] present with the person in his or her home or . . . accompany[ing] the person when outside of the home to monitor the person's safety and well-

being." 78 Fed. Reg. 60,557 (to be codified at 29 C.F.R. § 552.6(a)). These activities are consistent with the type of "care" provided by a babysitter to children and therefore are a reasonable definition of the type of services an "elder sitter" would provide to a senior or individual with disabilities. Moreover, in direct response to thousands of comments received during the rulemaking process, the companionship services definition also explicitly includes the provision of "care," defined as the provision of ADLs and IADLs. As the Department defined in the regulatory text and explained in the preamble, however, a limit on these types of professionalized services (including bathing, toileting, and transferring) is necessary to keep the definition consistent with the view, adopted from the legislative history of the 1974 amendments, that "companionship services" primarily means watching over a person as an elder sitter. *Id.* (to be codified at 29 C.F.R. § 552.6(b)). The selection of a 20 percent limit on the amount of care that might be provided before the exemption from the FLSA becomes inapplicable was based on historical practice and thus the familiarity of the regulated community with this type of threshold. *Id.* at 60,468, 60,469 (citing other FLSA regulations containing a 20 percent limit). The Department explained in the preamble that it was not suggesting that most home care workers do or should restrict their care activities to 20 percent of their work time, but instead was implementing a definition that would require employers of much of the growing, professionalized workforce—a workforce providing services well beyond the "elder sitting" contemplated in 1974—to pay those workers in compliance with FLSA requirements. *Id.*

Plaintiffs do not address the extensive justification for Section 552.6(b) in the Final Rule, nor do they refute any of the preamble's reasoning for the amendment.  Plaintiffs merely, and misleadingly, rely on part of a quote from the floor debate regarding the 1974 Amendments. When the quote is read in context,[13]  however, it is clear that Senator Burdick was asking a question and sought clarification regarding the meaning of the word "companion."  Senator Williams' answer elucidates to what Congress intended the word "companion" to refer:

---

[13] The complete exchange on the Senate floor provides:

Senator Burdick: I am not concerned about the professional domestic who does this as a daily living. But we have situations in which young people, a widow, a divorcee, or a family of low income, of necessity, must have someone sit with their children while they are at work.

We have another category of people who might have an aged father, an aged mother, an infirm father, an infirm mother, and a neighbor comes in and sits with them. This, of course, entails some work, such as perhaps making lunch for the children, or making lunch for the infirm person, and may even require throwing some diapers in the automatic washing machine for the baby.  This would be incidental to the main purpose of the employment.

The Senator has used the word "companion" in the exception. When the Senator uses the word "companion," the Senator does not mean that in the ordinarily accepted sense, that they are there to make them feel good. They are there to take care of them, he means, when he uses the word "companion." Is that correct?

Senator Williams: We use the situation in which people are in a household not to do household work but are there, first, as babysitters. I think we all have the full meaning in mind of what a babysitter is there for—to watch the youngsters.  "Companion," as we mean it, is in the same role—to be there and to watch an older person, in a sense.

Senator Burdick: In other words, an elder sitter.

Senator Williams: Exactly.

119 Cong. Rec. at 24,801.

"[T]he situation in which people are in a household not to do household work but are there, first, as babysitters. I think we all have the full meaning in mind of what a babysitter is there for—to watch the youngsters. 'Companion,' as we mean it, is in the same role—to be there and to watch an older person, in a sense.

119 Cong. Rec. 24,801. Moreover, Senator Burdick explained that while a being a companion may entail "some work" such as "making lunch for the infirm person," such work was "incidental to the main purpose of employment," which was to "come in and sit with" an "aged father" or "aged mother." 119 Cong. Rec. at 24,801. And indeed, this is precisely how the Department has restructured the companionship services definition; there is a 20 percent provision for some work such as making lunch, dressing, grooming, bathing, and toileting. 29 C.F.R. § 552.6(b) (as amended). But the main purpose of employment, the worker's primary duty, is to provide fellowship and protection. 29 C.F.R. § 552.6(a) (as amended). Plaintiffs acknowledge that their industry is "built on providing personal care to meet the ADL needs" of seniors and individuals with disabilities. Pls.' Mem, at 7. Yet there is not a single indication in the legislative history—and in fact, there are indications to the contrary, *see, e.g*., 119 Cong. Rec. at 24,801—that Congress intended to exempt domestic service workers that spend most of their time providing assistance with toileting, bathing, grooming, and other intimate personal care activities from the basic minimum wage and overtime compensation protections they were at the same time providing to other domestic service workers such as cooks, nannies, governesses, chauffeurs, and gardeners.

In light of the broad scope of services now commonly provided by home care workers, the Department's revised definition is more consistent with this explanation of the term than the definition in the 1975 regulation, which the Department did not have reason to carefully limit because nothing like the current home care industry existed at that time. Even so, of course,

plaintiffs cannot succeed on the merits of their claim if the Department's reading of the statute is simply consistent with the FLSA's language; the Department's view of the statute need not be more correct than plaintiffs'. *See Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.,* 254 F.3d 173, 187 (D.C. Cir. 2001) ("Although there may be other possible interpretations, *Chevron* deference does not require that we conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached.") (internal quotation marks and citation omitted). Plaintiffs also rely, in making their argument regarding Congressional intent, on cases interpreting the scope of the 1975 "companionship services" regulation broadly. The Department promulgated the regulation at issue, in part, in response to the very cases plaintiffs cite, which allowed the term "companionship services" to apply to the entire home care industry despite its purpose of creating a narrow exemption for elder sitters; the broad application of the exemption encompassed "essentially any services provided for an elderly person or person with an illness, injury or disability in the person's private home." 78 Fed. Reg. 60,459.

Plaintiffs also claim, without citing to specific data, that this definition should be overturned because the revised definition will now exclude the majority of its workers. But excluding from the exemption the majority of the skilled home care professionals for whom providing these services is a vocation is entirely consistent with the language of the FLSA and Congress' intent, and is one of the Department's stated reasons for promulgating the new definition. The mere fact that the Department's regulation entitles many workers to be paid at least the minimum amount that so many American workers recognize as their due, in accordance with Congressional intent to enact a narrow exemption—an exemption that originally applied to

only a small group of workers, to whom it still applies—is not a valid ground on which this Court should overturn the agency's regulation.

In addition, plaintiffs' speculative and unsupported warnings of disruption to the industry provide no basis for granting them relief on the merits. Such views were before the agency when it made its decision, and the agency addressed these comments in the Final Rule. *See* 78 Fed. Reg. 60,476. In fact, the preamble to the Final Rule discusses several studies showing that the economic impact of the Rule would benefit the industry as a whole, for example, by reducing the high turnover rates caused by low wages, as well as states whose public assistance programs are, in part, supporting many home care workers. *See* 78 Fed. Reg. 60,543, citing PHI Report at 70. For example, concerns regarding excessive overtime payments are unfounded: only about 9 percent of home care workers work more than 40 hours per week, and most of those work only slightly more than 40 hours per week. *See* National Employment Law Project, Comments to Proposed Revisions to the Companionship Exemption Regulations, RIN 1235-AA05, March 2012, at 13 ("NELP Comment") (attached as Exhibit 3); *see also* 78 Fed. Reg. 60,522, citing PHI Report at 61-64. Further, employers' efforts to curb overtime by cutting work to 40 hours per week per employee could have the beneficial effect of spreading work to more employees, creating more full time employment for workers. *See* NELP Comment at 13; *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577-78 (1942) (explaining that spreading work among a greater number of employees is one of the purposes of the FLSA overtime requirement).

Further, the agency relied on comments from consumer advocacy groups, such as the National Association of Area Agencies on Aging, who rebutted claims that narrowing the "companionship services" exemption would make home care services too costly for consumers. *See* Letter from Sandy Markwood, Chief Executive Officer, National Association of Area

Agencies on Aging, to Mary Zeigler, Director, Wage and Hour Division, U.S. Department of Labor, March 8, 2012 ("N4A Comment") (attached as Exhibit 4). In fact, the N4A Comment suggests that the low wages of home care workers increase Medicaid costs—because many of these employees are on public assistance—and that high turnover rates actually compromise care for consumers. [14] *Id.* at 2-3.

Plaintiffs' claim that Congress' failure to pass a bill modifying the "companionship services" exemption supports their position is also unavailing. That Congress has not enacted legislation narrowing the agency's discretion to "define[] and delimit[]" the term "companionship services," if it has any significance at all, only underscores how broad Congress' grant of authority is in this context, and that the agency is in the best position to define these terms based on its expertise in the area. *See Coke*, 551 U.S. at 165 ("The subject matter of the regulation in question concerns a matter in respect to which the agency is expert.") Further, Congressional inaction "is a notoriously poor indication of [C]ongressional intent." *Schweiker v.*

---

[14] Plaintiffs also assert that the Department's impact analysis must be redone under the Regulatory Flexibility Act in light of this Court's December 22, 2014 order. *See* Pls.' Mot. at 6. This assertion is meritless. As a preliminary matter, plaintiffs fail to raise this procedural challenge in their complaint, so the Court lacks jurisdiction to grant them injunctive relief on this claim. *See Sai v. Transportation Security Admin.*, --- F. Supp. 2d ---, 2014 WL 3029217 at *2 (D.D.C. July 7, 2014). Moreover, as plaintiffs concede, even though the third party regulation has been vacated by this Court, the majority of their employees are excluded from the "companionship services" exemption under the Final Rule. So, the impact on the industry is essentially the same, and the Final Rule's current impact analysis meets this procedural requirement. Further, the Court did not remand this rule to the agency for further fact-finding, and the district court's decision on one provision of the regulation—which may not be the final word on the matter—is not enough to bar the rest of an otherwise valid rule from going into effect. Indeed, the Regulatory Flexibility Act "imposes no substantive constraint on agency decisionmaking." *National Telephone Co-op Ass'n. v. F.C.C.*, 563 F.3d 536, 540 (D.C. Cir. 2009). It merely "requires agencies to publish analyses that address certain legally delineated topics," *id.*, and plaintiffs' cannot show that the agency has failed to do so here. *See* 78 Fed. Reg. 60,548-54.

*Chilicky*, 487 U.S. 412, 440 (1988); *see also Minor v. Bostwick Labs, Inc.,* 669 F.3d 428, 436 (4th Cir. 2012).[15]

For all these reasons, plaintiffs cannot meet their "burden . . . to show that the statute *unambiguously* supports [their] interpretation," *University of Texas M.D. Anderson Cancer Center v. Sebelius*, 650 F.3d 685, 690 (D.C. Cir. 2011) (emphasis in original). In fact, the "companionship services" definition passes muster under *Chevron* because it was promulgated pursuant to the agency's delegated authority, is consistent with the text of the FLSA and Congress' intent in creating the companionship services exemption, and it is reasonable. Plaintiffs' claims are not likely to succeed on the merits and, therefore, their motion must be denied.

———————————

[15] It also bears noting that the Department itself recognized the tension between Congress' intent in creating the 1974 exemption and the changing nature of the home care industry; in 1993 and again in 2001, the Department published notices of proposed rulemaking seeking to amend the third party employer regulation to narrow the scope of the exemption *See* 78 Fed. Reg. 60,457-58.

Specifically, in December 1993, the Department published an NPRM in the Federal Register inviting public comments on a proposal to revise 29 C.F.R. § 552.109 to clarify that, in order for the exemptions under 29 U.S.C. §§ 213(a)(15) and 213(b)(21) to apply, employees engaged in companionship services and live-in domestic service who are employed by a third party employer or agency must be "jointly" employed by the individual, family, or household using their services. *See* 78 Fed. Reg. 60,457. In September 1995, the Department published a proposed rule re-opening and extending the comment period on the proposed changes to 29 C.F.R. § 552.109 concerning third party employment, *see* 60 Fed. Reg. 46,797, but the Department did not finalize this rule.

In January 2001, the Department published an NPRM proposing to amend the regulations to prohibit employees of third parties from claiming the companionship services or live-in domestic service employee exemptions. 78 Fed. Reg. 60,458. In April 2001, the Department published a proposed rule re-opening and extending the comment period on the January 2001 proposed rule, but this rulemaking was eventually withdrawn and terminated. *Id.*; *see* 67 Fed. Reg. 16,668.

## II.     PLAINTIFFS CANNOT SATISFY THE IRREPARABLE HARM REQUIREMENT.

Plaintiffs have not shown the kind of irreparable injury that would warrant the extraordinary relief they seek in their motion: that in the week before the January 1, 2015 effective date of a Final Rule, which was promulgated fifteen months earlier and as to which plaintiffs chose not to fully brief the relevant issues, the Court stay the regulation.

### A.     Plaintiffs' Tactical Decision to Delay Litigating Counts III and IV of Their Complaint Until Just the Week Before the Effective Date of the Rule Undercuts Any Claim of Irreparable Injury.

As an initial matter, plaintiffs' delay in filing their motion is reason enough for its denial. The Final Rule was promulgated on October 1, 2013, so plaintiffs have had fifteen months during which they could have brought a challenge to the "companionship services" definition. Yet plaintiffs waited eight months after the Final Rule was published to file their complaint on June 6, 2014.  ECF No. 1.  Plaintiffs then requested that the case be litigated in stages, and asked defendants to agree to an expedited briefing schedule solely on the third-party regulation claims—Counts I and II of the complaint, *see* Compl. at ¶¶ 26-33—on the grounds that such a schedule was "necessary to give the Court sufficient time to review the issues and render a decision" regarding the third party regulation prior to the effective date of the Final Rule.  Joint Request for Proposed Expedited Briefing Schedule, ECF No. 7, at 1.  Defendants did not oppose this request.  *See id.* at 2.

Although it was almost six months ago that plaintiffs filed their complaint raising a challenge to the "companionship services" definition, plaintiffs waited until the week before the Final Rule's effective date—late in the afternoon on the day before the Court and the federal government would be closed for the next four days—to file their motion to stay the

companionship services definition. This inexcusable, unreasonable and prejudicial delay is by itself grounds for denial. *See Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."). This principle is well-established in this Circuit. *See, e.g., NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) ("If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court should be reluctant to award relief."). In fact, the D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the impending nature of the alleged irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *see also Indep. Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980) ("The venerable maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who slumber on their rights) requires that a suit in equity, though otherwise meritorious, be dismissed if two requirements are met: (1) unreasonable delay in bringing the claim for relief and (2) prejudice caused by that delay.")

Here, plaintiffs not only waited six months to seek relief on Counts III and IV of their complaint—which is sufficient reason under *Fund for Animals* to deny their motion—they affirmatively requested that the parties litigate only Counts I and II of the complaint in time for a decision by January 1, 2015. Plaintiffs' motion prejudices defendants by depriving them of the opportunity contemplated by the rules to fully brief their claims before this Court renders a decision regarding whether the rule can go into effect; defendants put off their briefing on the complex legal issues surrounding the companionship services definition at plaintiffs' request,

and now plaintiffs have filed a meritless motion that forces defendants to present their case in an opposition to a preliminary injunction motion.[16] Further, this last-minute uncertainty and delay will, in addition to depriving home care workers of the compensation they deserve, cause significant confusion in the home care industry, and will undermine the diligent efforts of the Department, states, and many private employers who have been preparing for this regulation to go into effect for over a year. *See* Declaration of Michael Hancock ("Hancock Decl.") at ¶¶ 22-24 (attached as Exhibit 5).[17]

Plaintiffs' only proffered reason for their delay—that they thought they lacked standing to pursue Counts III and IV of their complaint until this Court ruled on the parties' summary judgment motions regarding Counts I and II—simply cannot withstand scrutiny. In fact, under plaintiffs' reasoning, the Court must either dismiss Counts III and IV of the complaint for lack of subject matter jurisdiction, or deny plaintiffs' motion as inexcusably untimely. On the one hand,

---

[16] Plaintiffs requested that defendants agree to a stay of the rule pending briefing of this issue, but that option would also have prejudiced defendants significantly. The Department has a strong interest in the revised definition of companionship services going into effect, and so too, for the reasons explained below, does the public, *see supra* at Section III. The Court can only grant injunctive relief if plaintiffs demonstrate that the public interest favors an injunction, which they have not and cannot do here. As explained below, on the day the regulation goes into effect, employers' legal obligations to pay minimum wage and overtime to most home care workers begins; employees can immediately, under 29 U.S.C. § 216(b), file private suits to vindicate those rights if they are violated; and back wages the Department can file suit to recover after the conclusion of its time-limited non-enforcement policy start to accrue. It is neither appropriate nor just to allow plaintiffs to use their choice to brief only their challenge to the third party regulation before January 1 to pressure the Department into a delay of the effective date of its final, reasonable, procedurally proper companionship services definition.

[17] This declaration is submitted to support defendants' position as to all preliminary injunction factors other than likelihood of success on the merits.

"[w]hether a plaintiff has standing is determined at the time the suit commences," *La Botz v. Fed. Election Comm'n*, No. CV 13-997 (RC), 2014 WL 3686764, at *4 (D.D.C. July 25, 2014) (citing *Del Monte Fresh Produce Co. v. U.S.*, 570 F.3d 316, 324 (D.C.Cir.2009)). So if this Court believes that plaintiffs' lacked standing to challenge the definition of companionship services when they filed their complaint, the Court must dismiss Counts III and IV of the complaint for lack of subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that Article III standing "is an essential and unchanging part of the case-or-controversy requirement.")

On the other hand, if the Court rejects plaintiffs' implausible standing excuse, it must deny plaintiffs' December 24 motion as untimely, because if they had standing to bring Counts III and IV, plaintiffs could have sought relief as to those counts at any time after filing their complaint on June 6, 2014, and they have presented no credible reason to excuse their egregious delay. *See NRDC*, 147 F.3d at 1026 (explaining that without a reasonable explanation for a delay, courts should be hesitant to award injunctive relief). Plaintiffs' complaint challenges the third party employer regulation (29 C.F.R. § 552.109(a)) and the companionship services definition (29 C.F.R. § 552.6), both of which are promulgated under the agency's authority to "define[] and delimit[]" the term "companionship services." *See* 78 Fed. Reg. 60,482. If this Court had upheld the third-party regulation, the nature of plaintiffs' employees' work could still fall within the definition of companionship services under the Department's definition, even though third party agencies would be unable to avail themselves of the exemption. *See* 29 C.F.R. § 552.6 & 552.109(a). Further, the proposition that the Court's entry of an order maintaining the status quo that was in place when plaintiffs filed their complaint with regard to the third party employer regulation conferred standing is nonsensical and has no basis in law.

32

Thus, if the Court does not agree with plaintiffs' standing excuse—which, if sound, would itself require dismissal of Counts III and IV of the complaint for lack of subject matter jurisdiction—it must deny plaintiffs' motion as inexcusably untimely. Plaintiffs' implausible standing assertion does not come close to excusing the unjustified delay in seeking relief as to the companionship services definition, on which claims plaintiffs could have moved for summary judgment simultaneously with the third party employment regulation claims, particularly in light of the extreme prejudice to defendants and inconvenience to the Court plaintiffs' delay has caused. Rather than file their motion at a time that would have allowed the parties the opportunity to fully brief the complicated legal issues prior to the rule's effective date, plaintiffs waited six months to seek relief, and did so leaving defendants little time to present their arguments, and the Court even less time to consider them. And plaintiffs' decision to press their motion when and how they have has presented the many affected entities and individuals with a confounding situation just as a long- and carefully-planned-for change in the way home care workers are paid was to go into effect. Plaintiffs' rush towards a decision on their claims underscores the complete lack of any valid legal challenge to the Department's definition of companionship services. *See, e.g., Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm").

### B. Plaintiffs Have Not Demonstrated Any Irreparable Harm That Might Warrant Injunctive Relief.

Even if plaintiffs had not delayed briefing this issue for so long that the timing undermines any showing of irreparable harm, they cannot show that they face any harm so "substantial and immediate" as to justify emergency relief. *See Gordon v. Holder*, 721 F.3d 638,

653 (D.C. Cir. 2013). The D.C. Circuit has "set a high standard to establish irreparable harm." *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 335 (D.D.C. 2009) (Leon, J.). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) (Leon, J.), *appeal dismissed sub nom. Geo Specialty Chemicals, Inc. v. Foley & Lardner, LLP*, No. 13-7042, 2013 WL 4711684 (D.C. Cir. Aug. 23, 2013) (citations and internal quotations omitted). Plaintiffs' alleged irreparable harm fails to meet this high bar.

As a preliminary matter, all of plaintiffs' allegations of harm are speculative and unsupported. *See Sinclair National Bank v. Office of the Comptroller of the Currency*, No. 00-2398, 2000 WL 34012862, at *3 (D.D.C. Dec. 18, 2000) ("speculative and conclusory affidavits do not warrant a finding that plaintiff has shown any irreparable harm"). Plaintiffs' four declarations rely solely on speculative and conclusory statements that do not "substantiate the claim that irreparable injury is likely to occur." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "Because the court is charged with deciding 'whether the harm will in fact occur' when contemplating injunctive relief, '[b]are allegations of what is likely to occur are of no value.'" *Brown v. D.C.*, 888 F. Supp. 2d 28, 32 (D.D.C. 2012) (Leon, J.), quoting *Wis. Gas. Co.*, 758 F.2d at 674. The declarations plaintiffs submitted contain nothing more than bare allegations. For instance, the Declaration of William Dombi refers to amorphous "costs" and "changes" but fails to identify either with any specificity. *See generally* Declaration of William Dombi ("Dombi Decl."), ECF No. 23-3. That declaration, and plaintiffs' submissions as a whole, glaringly provide no data or statistics to support their conclusory claims regarding the

costs of paying overtime compensation.  In particular, plaintiffs and their declarants fail to approximate how many consumers receive more than 40 hours per week of care from a single, non-live-in worker per week.  Plaintiffs' claims concerning a "shift" to a part-time workforce and the replacement of full-time caregivers in fact are nonsensical; if a consumer is receiving 40 hours per week of home care from a single worker, and that worker is already receiving the minimum wage, then there are no additional costs to the consumer as a result of the new companionship services regulation.  Additionally, regulatory changes routinely occur and businesses are required to adjust.  In most cases, businesses are not provided with over a year of notice about these changes, as plaintiffs were in this case.

Further, the alleged harm to both third party employers and consumers that plaintiffs describe in their complaint is premised on the assumption that plaintiffs will respond to the Rule by limiting the types of services their workers will provide such that their work will meet the revised definition of companionship services.   Pls.' Mot. at 7.  Plaintiffs cannot rely on speculative allegations that they might voluntarily choose to respond to the rule in the manner most damaging to their business interests (rather than simply pay minimum wage and overtime or manage workers' overtime hours) to demonstrate irreparable harm.  *See, e.g., Safari Club Int'l v. Jewell,* No. CV 14-0670 (ABJ), 2014 WL 2535948, at *5 (D.D.C. June 6, 2014) *appeal dismissed sub nom. Safari Club Int'l v. Jewell*, No. 14-5152, 2014 WL 5838221 (D.C. Cir. Nov. 7, 2014) ("[A]ny economic harm [plaintiffs] may suffer arises out of their own decisions to cancel or change their plans and, therefore, it is indirect, selfinflicted [sic], and not irreparable harm.") (citing *Wis. Gas*, 758 F.2d at 674; *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).  Further, plaintiffs' assertion that they would restructure their services in a way that would compromise care calls into question any claim that plaintiffs seek relief to prevent harm to

consumers.  This threat is further undermined by the fact that employers could easily take other steps to mitigate costs; as described in the Final Rule, employers could choose to comply with the rule in several ways, including limiting the number of hours an employee may work each week (as opposed to limiting the types of services an employee provides), in order to minimize overtime compensation costs.  And in fact, the evidence before the Department when it promulgated the Rule shows that employers' efforts to limit workers to 40 hour work-weeks to avoid paying overtime has the benefit of spreading work to more home care workers.  *See* NELP Comment at 13; *see also Missel*, 316 U.S. at 577-78.

At its core, plaintiffs' motion rests on the claim that it will suffer nonspecific monetary harm when the Rule goes into effect, but it is "well-settled that monetary loss constitutes irreparable harm only where the loss threatens the very existence of the movant's business."  *See Bill Barrett Corp.*, 601 F. Supp. 2d at 335 (quoting *Wis. Gas Co.*, 758 F.2d at 674).  Plaintiffs' speculative and vague allegations of "unrecoverable costs" are therefore insufficient to justify injunctive relief.  *See also GEO Specialty Chemicals*, 923 F. Supp. 2d at 148 ("[I]t is 'well-settled that economic loss does not, in and of itself, constitute irreparable harm' because it is merely economic in character and not sufficiently grave enough to warrant emergency injunctive relief.") (quoting *Wis. Gas.*, 758 F.2d at 674).   Plaintiffs refer generally to "unrecoverable costs" but make no showing regarding the nature and extent of these costs or their projected impact on home care agencies.  But even if they had, the "fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."  *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).   Absent any showing that the speculative monetary loss "threatens the very existence" of plaintiffs' members' businesses, *see Bill Barrett Corp.* 601 F. Supp. 2d at 335—and unsupported and conclusory allegations to this effect are not

sufficient to prove this point, *see Wis. Gas Co.*, 758 F.2d at 674—plaintiffs have failed to demonstrate any concrete and supported harms that will result from the Final Rule going into effect.

Plaintiffs' contentions concerning state Medicaid programs are similarly speculative and unsupported. The Declarations of Bruce Darling, Kelly Buckland, and Kari Bruffet, ECF Nos. 23-4, 23-5, 23-6, are largely focused on harms that could result from states' adjustments to their Medicaid-funded home care programs. These state decisions (or a state's failure to prepare its programs for implementation in a timely manner, as suggested by the Bruffet declaration) are not before the Court in this case and do not directly result from the Final Rule, which requires the payment of minimum wage and overtime compensation to certain workers, but does not require that employers cut back on worker hours or permit workers to work unlimited overtime. The Declaration of Bruce Darling, ECF No. 23-4, cites to one letter from one third party employer based in Rochester, New York that also references state minimum wage law changes; this is hardly evidence of the widespread harms plaintiffs allege in their motion. These declarations, therefore, cannot form a basis for plaintiffs to meet their burden of showing irreparable harm. *See Wis. Gas. Co.* 758 F.2d at 674.

Furthermore, defendants have produced evidence that counters plaintiffs' assertions about harm that will result from revised 29 C.F.R. § 552.6. A broad coalition of government agencies, consumers, advocates, and employers have been working diligently for several months to ensure that state Medicaid programs are prepared for implementation, and—although plaintiffs have failed to mention this fact—several states have made great progress. *See* Hancock Decl. at ¶¶ 16-19; Declaration of Kirk Adams ("Adams Decl.") at ¶ 8 (attached as Exhibit 9). In particular, two very populous states employing home care workers, California and New York, had plans in

place to provide funding to Medicaid programs in order to adjust for the effects of the Final Rule. *See* Hancock Decl. at ¶¶ 16-19.

Additionally, the attached declaration from Henry Claypool, the Executive Vice President of the American Association for People with Disabilities, the nation's largest disability rights organization, undermines plaintiffs' allegation that the rule will harm recipients of services and home care workers. *See* Declaration of Henry Claypool (attached as Exhibit 6). The declaration explains that the instability of the home care workforce directly and adversely impacts persons with disabilities; delaying the provision of minimum wage and overtime compensation protections to home care workers who perform professionalized home care services within a formalized, commercialized home care industry, will halt efforts to ensure these protections as the foundation for forming a stable and competent workforce. *See* Claypool Decl. at ¶ 6-7.

Because Plaintiffs have failed to meet their burden of showing that irreparable harm will result from the revised definition of "companionship services" going into effect, their motion should be denied.

### III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, plaintiffs have not shown that the balance of harms and public interest weigh in their favor. *Cf. Nken v. Holder*, 129 S. Ct. 1749, 1762 (2009) (explaining in the context of a stay pending appeal that the final two factors of the traditional preliminary injunction inquiry—harm to the opposing party and the public interest—merge when the federal government is the opposing party). The Supreme Court has cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Here, the balance of the equities and the public interest weigh overwhelmingly against granting plaintiffs injunctive relief.

As established above, the only direct and non-speculative effect of the rule that plaintiffs can demonstrate is that they will have to pay their employees minimum wage for all hours worked and overtime compensation for any hours worked over 40 in a workweek.  Such pecuniary harm, however, does not rise to the level of irreparable harm as a matter of law.[18]  *See Wis. Gas*, 758 F.2d at 674.

### A. Home Care Workers Will Be Irreparably Harmed by a Preliminary Injunction and Will Not Be Able to Recover Any Unpaid Wages for the Duration of the Injunction.

Defendants submit five declarations to show that the harm to the public from staying the effective date of the Rule far outweighs plaintiffs' speculative allegations of lost profits.[19]  In any balancing of harms, it should be taken into account that average wages for home care workers are below $10 per hour, and in 2009, approximately half of home care workers lived in households that received public benefits, such as food stamps or Medicaid.  Hancock Decl. at ¶ 3.  The home care industry is currently plagued with extremely high turnover rates, which has

---

[18] Plaintiffs have made no showing that having to pay their employees minimum wage and overtime "threatens the very existence" of plaintiffs' members' businesses.  *Bill Barrett Corp*. 601 F. Supp. 2d at 335.

[19] Defendants' declarations should not be considered in deciding the merits of this case; any consideration of the merits of the Rule is limited to the administrative record. *See CTS Corp. v. EPA*, --- F.3d ---, No. 12-1256, 2014 WL 3056493, at *10 (D.C. Cir. July 8, 2014) ("It is 'black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.'" (citation and internal quotation marks omitted)).  Defendants' declarations are submitted to support their position as to all preliminary injunction factors other than the likelihood of success on the merits.

been shown to be, at least in part, caused by low wages in the industry, so the lack of protections for these workers affects the standard of care consumers receive as well. *Id*. at ¶ 2; Declaration of Dorie Seavey ("Seavey Decl.") at ¶ 6-7 (attached as Exhibit 7); Claypool Decl. at ¶ 5. Because the revised definition of companionship services did not go into effect on January 1, 2015, and for each additional day the revision to 29 C.F.R. § 552.6 is stayed, nearly two million home care workers will be denied minimum wage and overtime protections to which they would otherwise be entitled. Hancock Decl. at ¶ 21-22. Workers who do not receive the minimum wage protections of the Act are necessarily vulnerable to exploitation, and those employees cannot use the Act to recover back wages—whether for wages below the Federal minimum, such as exist in at least one home care program in Kansas, *see id.* at ¶ 23, or for missed paychecks, falsified timesheets, or other denials of payment for time worked, *id*. at ¶ 21. These workers would be deprived of overtime compensation as well, leaving many of them in a position to rely on public benefits, despite working more than full time in a demanding job. *Id*. at ¶ 3, 22. And even if home care employers do choose to limit home care workers' hours to avoid overtime costs, that decision would spread work, benefiting part-time employees and new employees in this growing field. *Id*.; NELP Comment at 13; *Missel*, 316 U.S. at 577-78.

If the Court further stays the effective date of the rule, despite plaintiffs' utter failure to demonstrate any eligibility for such an extreme remedy, these two million workers lose more than just wages. Once the new definition of companionship services goes into effect, these workers will have a private right of action to recover unpaid minimum wage and overtime compensation for employers who violate these provisions. *See* 29 U.S.C. § 216(b). The FLSA provides the Department of Labor with authority to file suit against an employer who violates the Act's minimum wage and overtime protections. *See* 29 U.S.C. § 216(c). Therefore, staying the

effective date of the rule denies these employees a private right of action to which they were to become entitled on January 1, 2015, and limits employers' liability to these employees in suits filed by the Department.

It is for these reasons that the Department did not delay the effective date of the rule any longer than the unprecedented 15 months that have already passed since its promulgation. The Department announced that although employers would be obligated to comply with the rule as of January 1, 2015, it would not use its authority to bring enforcement actions for violations of FLSA requirements newly resulting from the rule for six months to allow the Department to focus its resources on providing additional assistance to states as they make adjustments to their operations, programs, and budgets to ensure compliance with the FLSA. 79 Fed. Reg. 60,974. This non-enforcement policy has no effect on the private right of action of home care workers and does not preclude the Department from ultimately recovering back wages accrued during this period. Hancock Decl. at ¶ 21; 29 U.S.C. § 216.

### B. The Progress that Has Been Made Toward Implementation Will Be Irreparably Disrupted by a Preliminary Injunction.

Significantly, some states, including several with large publicly funded home care programs, have made preparations to arrange for funding for these services, and these processes could be irreparably disrupted if the Court stays the effective date of the rule for an indeterminate amount of time. Hancock Decl. at ¶¶ 15-18, 24; Claypool Decl. at ¶¶ 8-9; Declaration of Lance Kilpatrick ("Kilpatrick Decl.") at ¶¶ 8-9 (attached as Exhibit 8); Adams Decl. at ¶¶ 6-8. Notably, in California, overtime funding for many thousands of home care workers is tied to the effective date of the Final Rule. Hancock Decl. at ¶ 16. After this Court stayed the effective date of the Rule until January 15, 2015, *see* ECF No. 26, California announced that it would not implement

a carefully negotiated resolution, and would not begin to pay homecare workers overtime as of January 1, 2015. Adams Decl. at ¶ 6. The effect of this is that approximately 385,500 home care workers will suffer reduced pay due to the Court's temporary restraining order. *Id*. at ¶ 7. Other states who have been preparing—with assistance from the Department and consumer and disability advocacy groups—to implement programs to ensure compliance the rule will also find their efforts undermined. *Id*. at ¶ 8; Kilpatrick Decl. at ¶¶ 8-9; Claypool Decl. at ¶¶ 9-10. The problems created by confusion and uncertainty regarding the effective date are especially significant in regard to budgetary adjustments, because states operate on annual or biannual budget cycles, and most budget decisions for the next one or two years will be made in the early part of 2015. Hancock Decl. at ¶ 26; Adams Decl. at ¶ 8. Delaying the effective date of the rule strains state budgets in other ways as well: poor wages for home care workers ultimately result in workers' restricted ability to provide care, which leads to increased costs from both unnecessary hospitalization and institutionalization of consumers; inadequate pay leaves many home care workers below the poverty line and dependent on public assistance such as food stamps. Seavey Decl. at ¶ 9. In Wisconsin, the cost to the state of providing such benefits to home care workers is "tantamount to a public subsidy of $1 to $2 for every hour worked by a Wisconsin direct-care worker." *Id*., citing PHI, State Facts: Wisconsin's Direct Care Workforce 5 (2011). Thus, any continued delay of the effective date of the rule adversely impacts not only workers, but also states, consumers and the public in general. By contrast, plaintiffs have had fifteen months to prepare to pay their employees minimum wage and overtime; they can show no significant harm that outweighs the detrimental effects of staying the Rule's effective date any further.

Moreover, the deleterious effects discussed above are likely to last far longer than the length of any injunction. As explained in all five Declarations attached to this Memorandum, the

changes to state Medicaid programs in order to prepare for implementation take time, resources, and considerable organizational effort, and the progress that has been made is the result of a broad group of stakeholders working diligently for many months, including not just efforts by worker and disability rights advocates and engaged private employers but also collaboration between states, the Department, and other federal agencies. Delaying the movement towards compliance at this late date would not be beneficial to states, home care programs, workers, or the individuals who rely on home care.

## CONCLUSION

Because plaintiffs cannot meet their burden to show that any of the factors required for a preliminary injunction are present, their motion should be denied.

Dated: January 5, 2015      Respectfully submitted,

| | |
|---|---|
| M. PATRICIA SMITH | STUART F. DELERY |
| Solicitor of Labor | Assistant Attorney General |
| | |
| JENNIFER S. BRAND | RONALD C. MACHEN, JR. |
| Associate Solicitor | United States Attorney |
| | |
| PAUL L. FRIEDEN | JUDRY L. SUBAR |
| Counsel for Appellate Litigation | Assistant Branch Director |
| | |
| MELISSA A. MURPHY |   /s/ Julie S. Saltman    |
| Senior Attorney | JULIE S. SALTMAN (DC Bar No. 975015) |
| | Trial Attorney |
| SARAH K. MARCUS | United States Department of Justice |
| Attorney | Civil Division, Federal Programs Branch |
| U.S. Department of Labor | 20 Massachusetts Avenue N.W., Room 7111 |
| 200 Constitution Ave NW, N-2716 | Washington, D.C. 20530 |
| Washington, DC 20210 | Tel: (202) 532-4252 |
| | Fax: (202) 616-8470 |
| | Email: Julie.saltman@usdoj.gov |
| | |
| | Attorneys for Defendants |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to all parties.

_/s/ Julie S. Saltman_____
JULIE S. SALTMAN