**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
HOME CARE ASSOCIATION OF AMERICA, *et al*        )
                                                          )
                    Plaintiffs,                           )
v.                                                        )      Case No. 1:14-cv-00967
                                                          )
DAVID WEIL, *et al*                                       )
                                                          )
                    Defendants.                           )
_____)


**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST**
**FOR PRELIMINARY INJUNCTION**

Maurice Baskin (D.C. Bar No. 248898)
Littler Mendelson, P.C.
1150 17th St., N.W.
Washington, D.C. 20036
Telephone: 202.772.2526
Fax:    202.318.4048
mbaskin@littler.com


William A. Dombi
D.C. Bar No. 445832
Center for Health Care Law
228 Seventh Street, SE
Washington, D.C. 20003
Telephone: (202) 547-5262
Facsimile:  (202) 547-7126
wad@nahc.org

Attorneys for Plaintiffs

Table of Contents

PAGE

I.     CONTRARY TO DEFENDANTS' OPPOSITION, PLAINTIFFS ARE LIKELY
       TO SUCCEED ON THE MERITS........................................................................ 1

       A.     The New Section 552.6 Violates Both The Plain Language And
              Legislative Intent Underlying The Companionship Exemption. ........................ 1

       B.     The New Section 552.6 Is Arbitrary And Capricious........................................... 6

       C.     Section 552.6 Must Also Be Vacated Because It Is Now Beyond Dispute
              That No Adequate RFA Impact Analysis Has Been Done To Take Into
              Account This Court's Order Vacating Section 552.109. ..................................... 10

II.    PLAINTIFFS HAVE SATISFIED THE IRREPARABLE HARM
       REQUIREMENT........................................................................................... 12

       A.     Contrary To The Department's Opposition, No Basis Exists To Find
              "Inexcusable Delay." ........................................................................... 12

       B.     Contrary To The Department's Opposition, Plaintiffs Have Demonstrated
              Irreparable Harm Warranting Injunctive Relief.................................................. 14

III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH
       OVERWHELMINGLY IN PLAINTIFFS' FAVOR....................................................... 18

IV.    CONCLUSION............................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alf v. Donley,*
    666 F. Supp. 2d 60 (D.D.C. 2009) ...................................................................................16

*Altman v. SEC,*
    666 F. 3d 1322 (D.C. Cir. 2011) .....................................................................................6

*Amicus, Inc. v. American Cable Co., Inc.,*
    660 F. Supp. 161 (E.D. La. 1987) ..................................................................................14

*Associated Builders and Contractors, Inc. v. Shiu,*
    13-1806 (D.D.C. Mar. 21, 2014) ...................................................................................13

*Association of Private Colleges v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) .........................................................................................7

*Bill Barrett Corp. v. U.S. Dep't of Interior,*
    601 F. Supp. 2d 331 .......................................................................................................17

*Brady Campaign to Prevent Gun Violence v. Salazar,*
    612 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................................16

*Brown v. District of Columbia,*
    888 F. Supp. 2d 28 (D.D.C. 2012) (Leon, J.) ...............................................................17

*Carol Morris v. District of Columbia,*
    C.A.No. 14-0338 (D.D.C. April 25, 2014) ....................................................................12

*Clarke v. Office of Federal Housing Enterprise Oversight,*
    365 F. Supp. 2d 56 (D.D.C. 2004) (Leon, J.) ...............................................................17

*Coast Alliance v. Babbitt,*
    6 F.Supp.2d 29 (D.D.C. 1998) ......................................................................................12

*Commodity Futures Trading Comm'n v. Schor,*
    478 U.S. 833 (1986) .........................................................................................................6

*Cook v. Diana Hays & Options, Inc.,*
    212 F. App'x. (5th Cir. 2006) .....................................................................................2, 3

*Cook v. Diana Hays and Options, Inc.,*
    212 F. Appx. (5th Cir. 2006) ...........................................................................................4

PAGE

*Creekstone Farms Premium Beef, LLC v. Department of Agriculture*,
    539 F. 3d 492 (D.C. Cir. 2008) ................................................................6

*Dkt Intern. v. U.S. Agency for Intern. Development*,
    435 F.Supp.2d 5 (D.D.C. 2006) ..............................................................12

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................7

*Fowler v. Incor*,
    279 F. App'x 590 (10th Cir. 2008). (Opp. at 5) ....................................3

*Fund for Animals v. Frizzell*,
    530 F. 2d 982 (D.C. Cir. 1975) ..............................................................14

*Geo Specialty Chemical, Inc. v. Husisian*,
    923 F. Supp. 2d 143 (D.D.C. 2013) (Leon, J.) ......................................17

*Gold v. Eng'g Contractors, Inc.*,
    831 F. Supp. 2d 856 (D. Md. 2011) ......................................................14

*Indep. Bankers Ass'n v. Heian*,
    627 F.2d 486 (D.C. Cir. 1980) ..............................................................14

*La Botz v. Fed. Election Comm'n*,
    No. CV 13-997 (D.D.C. July 25, 2014) ................................................13

*McCune v. Oregon Senior Servs. Div.*,
    894 F. 2d 1107 (9th Cir. 1990) ..............................................................3

*MD/DC/DE Broadcasters Ass'n v. FCC*,
    253 F.3d 732 ............................................................................................11

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................6, 7

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ......................................................14

*NLRB v. Bell Aerospace v. NLRB*,
    416 U.S.267 (1974) ................................................................................6

*NRDC v. Pena*,
    147 F. 3d 1012 (D.C. Cir. 1998) ............................................................14

*Pennenvironment v. PPG Industries, Inc.*,
    2014 WL 6982461 (W.D. Pa. 2014) ......................................................14

**PAGE**

*R.J. Reynolds Tobacco Co. v. United States Food and Drug Administration,*
    823 F. Supp. 2d 36 (D. D.C. 2011) (Leon, J.)..........................................................17

*Sai v. Transportation Security Admin.,*
    2014 WL 3029217 (D.D.C. July 7, 2014)..............................................................10

*Salyer v. Ohio Bureau of Wokers' Comp.,*
    83 F. 3d 784 (6th Cir. 1996) ....................................................................................2

*Sayler v. Ohio Bureau of Workers' Comp.,*
    83 F. 3d 784 (6th Cir. 1996) ....................................................................................4

*Sebelius v. Auburn Regional Med. Ctr.,*
    133 S. Ct. 817 (2013)...............................................................................................6

*Smoking Everywhere, Inc. v. FDA,*
    680 F. Supp. 2d 62 (D.D.C. 2010) (Leon, J.)........................................................17

*Texas Children's Hopsital v. Burwell,*
    C.A. No. 14-2060 (EGS), 2014 U.S. Dist. LEXIS 177644 (D.D.C. Dec. 29, 2014).........14, 16

*Welding v. Bios Corp.,*
    353 F. 3d 1214 (10th Cir. 2004) ..............................................................................5


**OTHER AUTHORITIES**

78 Fed. Reg. 60464 ............................................................................................................1

78 Fed. Reg. 60497, *et seq.*................................................................................................11

119 Cong. Rec. 24,797 .......................................................................................................5

119 Cong. Rec. 24,801.......................................................................................................4

Federal Rule of Civil Procedure 65(a)(2) ........................................................................12

S. 1273 (112th Cong. 2011)................................................................................................5

S. 2062 (110th Cong. 2007)................................................................................................5

S. 3696 (113th Cong. 2013)................................................................................................5

www.oxforddictionaries.com/us/definition .......................................................................2

Firmwide:131046550.1 080789.1000

## I.   CONTRARY TO DEFENDANTS' OPPOSITION, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   The New Section 552.6 Violates Both The Plain Language And Legislative Intent Underlying The Companionship Exemption.

Far from justifying the merits of the new Section 552.6, the Department's Opposition confirms Plaintiffs' argument that this challenged provision derives from exactly the same erroneous interpretation of Congress's intent that the Supreme Court and this Court have already rejected in connection with Section 552.109.[1]   Contrary to the Department's Opposition, Congress did not express any intent to restrict the companionship exemption to those few workers who only "incidentally" care for the elderly and infirm. Nor did Congress intend to exclude those who engage in care giving as a "vocation" from providing exempt companionship services. As this Court correctly held in vacating Section 552.109 [Dkt.#21]: "Congress did not include a "casual basis," employer-based, or any other modifier when exempting "any employee" providing companionship … domestic services." *Id*. at 13-14.  For the same reasons, Section 552.6 must be vacated as well.

The Department's Opposition incorrectly states that Plaintiffs "point to no statutory language – nor could they – that conflicts with the Department's definition of "companionship services."  (Opp. at 21).  To the contrary, we could and we <u>did</u> point to such plain language on page 4 of Plaintiffs' Motion Memorandum.  As stated therein: "The statute itself makes clear that the exemption applies to: "any employee employed in domestic service employment to provide

---

[1] *See also* 78 Fed. Reg. 60464, cited in Plaintiff's initial Memorandum, in which the Department stated its justification for Section 552.6 in the Final Rule: "The legislative history indicates that Congress intended to remove from the FLSA's minimum wage and overtime compensation protections only those domestic service workers for whom domestic service was not their vocation …" 78 Fed. Reg. 60464.  Again, this is the <u>identical</u> rationale to that which the Court struck down in its ruling on Section 552.109. [Dkt. #21, slip op. at 13-14].

companionship services for individuals who (because of age or infirmity) ***are unable to care for***

***themselves***….” (emphasis in Plaintiffs’ original). (Pl. Mem. at 4).  The exemption’s express

inclusion of “care” as a core purpose of companionship services directly conflicts with the

Department’s mischaracterization of care as merely “incidental” activity, and specifically

conflicts with the Department’s narrowing the exemption of caregiving to 20 percent of

caregivers’ working hours in Section 552.6.[2]

The Department’s Opposition actually concedes that the new Rule “narrows” the

exemption created by Congress. (Opp. at 20).[3]  Such “narrowing” of statutory language is not the

province of a regulatory agency.  Only Congress has the power to “narrow” its statutory

exemptions, and Congress did not authorize the Department to engage in such narrowing here.[4]

As was further cited in Plaintiffs’ opening Memorandum, based upon the plain language

of the exemption, numerous courts have upheld the Department’s previous definition of

companionship services as being consistent with Congressional intent.  *See Salyer v. Ohio*

*Bureau of Wokers’ Comp*., 83 F. 3d 784,787 (6th Cir. 1996); *Cook v. Diana Hays & Options,*

*Inc*., 212 F. App’x., 295, 296-97 (5th Cir. 2006). The Department’s Opposition incorrectly

---

[2] For the past four decades, “care” was included in the previous Section 552.6 along with “fellowship” and “protection” as one of the three basic functions of companionship. It simply cannot be denied that the new Rule removes the term “care” from the core regulatory definition of companionship in 552.6(a). The Department now references caregiving services only as incidental to exempt companionship, and only if provided within the 20 percent limitation imposed by 552.6(b).

[3] As stated in the Opposition: “By narrowing this exemption, the Department extended the minimum wage and overtime protections of the FLSA to those workers for whom home care is a profession.” *Id*. The Opposition further acknowledges that the Final Rule “narrows the exemption’s scope….”*Id*. (emphasis added).

[4] There is no support for the Department’s claim that its authority to “define and delimit” the terms used in Section 13(a)(15) allowed it engage in “narrowing” the scope of the exemption. (Opp. at 16). To “define” a term means “to state or describe something exactly” or to “mark a boundary” not to unilaterally narrow a description. Likewise, to “delimit” a term means to establish the limits or boundaries of something, not to unilaterally narrow those boundaries. www.oxforddictionaries.com/us/definition.

claims that these authorities, and other similar cases,[5] somehow justify changing the regulatory definition (Opp. at 4), when in fact the case law uniformly demonstrates that the old regulation was supported by the Act's plain language.  The Department's new definition of companionship is <u>not</u> consistent with the Act's plain language.

The above cited cases are also significant because they undermine the Opposition's reliance on a string cite of cases declaring that FLSA exemptions generally should be "narrowly construed."  (Opp. at 20-21)  Significantly, none of the cases in the Opposition's string cite construed the companionship exemption. By contrast, the Sixth Circuit in *Salyer,* while agreeing with the general principle of narrow statutory construction of exemptions under the FLSA, then went on to note: "Despite the wide swath these definitions cut, the FLSA does not apply to everyone who has a job."  The court thereupon proceeded to find companion care givers to be exempt under the Act.  Likewise, in *McCune v. Oregon Senior Servs. Div.*, 894 F.2d at 1109, the Ninth Circuit affirmed the general principle of narrow statutory construction, but then held: "Nevertheless, the legislative history of the FLSA and the statutory language of the exemption demonstrate that Congress clearly recognized that companions would be an exempt sub-category of domestic service workers." The court again upheld the exemption of contested caregivers under the plain language of the Act.  To the same effect are *Fowler*, 279 F. App'x at 596; and *Cook*, 212 F. App'x at 296-97.

In attempting to justify its improper narrowing of Congress's plain language, the Department's Opposition mischaracterizes the legislative history of the companionship exemption in a variety of ways.   First, the Department's Opposition conflates legislative references to incidental "household work" with the unrelated core requirement of "care." Indeed,

---

[5] *See also McCune v. Oregon Senior Servs. Div.*, 894 F. 2d 1107, 1108-09 (9th Cir. 1990); *Fowler v. Incor*, 279 F. App'x 590, 596 (10th Cir. 2008). (Opp. at 5).

in virtually every instance in which a legislator or committee report referred to an activity as "incidental," the activity described is "household work" and not the "care" which has long been understood to be a core function of companionship services.   119 Cong. Rec. 24,707 (Statement of Sen. Dominick); 119 Cong. Rec. 24,801 (statement of Sen. Williams)).[6]

Other instances of legislative history relied on by the Department's Opposition fail to support the revised definition of Section 552.6, because they deal only with Congressional intent not to exempt services performed by "trained personnel such as nurses." (Opp. at 19, citing Senate Rep. No. 93-690, 93rd Cong., 2d Sess., p. 20 (1974)).  This is again not the issue Plaintiffs are challenging in this case. Nowhere does the Opposition cite a statement by any Congressman treating as non-exempt any care giver who is providing non-professional home "care." Moreover, trained nurses do not normally perform the core functions of companionship. Certainly, the ADLs of "dressing, grooming, feeding, bathing, toileting, and transferring" are not typically performed by nurses, and nursing activities are simply not at issue in the challenged provision of the new Rule. *See also, e.g., Sayler v. Ohio Bureau of Workers' Comp.*, 83 F. 3d 784, 787 (6th Cir. 1996) (holding that a non-nursing employee who helps an infirm individual dress, bathe, and get around the home is providing companionship services within the meaning of the Act); *Cook v. Diana Hays and Options, Inc.*, 212 F. Appx., 295, 296-7 (5th Cir. 2006) (holding that a direct care worker who assisted in the home with "eating, baths, and teeth brushing, and accompanied the client to doctors and grocery stores was providing exempt services").

---

[6] This distinction is evident in the extended version of the colloquy between Senators Burdick and Williams quoted in the Opposition. (Opp. at 23-24).  Senator Burdick asks Senator Williams to confirm that "companions" are "to take care of" [the infirm].  To which Senator Williams responds that they are not there to do "housework."  119 Cong. Rec. 24,801.

The Department's Opposition also ignores entirely the expressed intent of Congress to exempt home care workers from overtime in order to keep such services affordable for the families of the elderly and disabled. The Department's Opposition does not address any of the statements in the Congressional Record that establish this Congressional intent. *See* 119 Cong. Rec. 24,797 (1973) (statement of Sen. Dominick); *Id.* at 24,798 (statement of Sen. Johnston); *Id.* at 24,801 (statement of Sen. Burdick). Nor does the Department's Opposition explain how the new Section 552.6 is consistent with the Congressional concern expressed over increased costs. *See Welding v. Bios Corp.,* 353 F. 3d 1214, 1217 (10th Cir. 2004) (holding that Congress created the companionship exemption in order "to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them.").

Finally, the Department's Opposition gives short shrift (again) to the fact that Congress has amended the FLSA without overruling the Department's previous longstanding interpretations of the Act. *See* "The Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong. 2007); "The Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273 (112th Cong. 2011); and "The Direct Care Workforce Empowerment Act of 2013," H.R. 5902 and S. 3696 (113th Cong. 2013). Meanwhile, Congress has repeatedly amended the FLSA to modify other exemptions, without changing the Department's exemption of home care workers.

The Department's Opposition has again failed to distinguish or meaningfully address the case authority previously cited by this Court [Dkt. #21, slip op. at 17], which holds that Congressional re-enactment of a statute without pertinent change to an agency's longstanding interpretation of it is "persuasive evidence that the interpretation is the one intended by

Congress." *NLRB v. Bell Aerospace v. NLRB*, 416 U.S.267, 274-75 (1974); *see also Sebelius v. Auburn Regional Med. Ctr.,* 133 S. Ct. 817, 827 (2013); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986); *Altman v. SEC*, 666 F. 3d 1322, 1326 (D.C. Cir. 2011); *Creekstone Farms Premium Beef, LLC v. Department of Agriculture*, 539 F. 3d 492 (D.C. Cir. 2008).  For this reason as well, contrary to the Department's Opposition, the Department's new Rule must be found to be inconsistent with legislative intent.

For each of these reasons, the Department's radical redefinition of companionship services in Section 552.6 so far exceeds the scope of Congressional authority and legislative intent as to violate the Act's plain language under *Chevron* Step I. Alternatively, the Department's sweeping change to the definition of companionship services in Section 552.6 is not a permissible construction of the Act under *Chevron* Step II and is arbitrary and capricious within the meaning of the APA.  As stated in Plaintiffs' initial Memorandum, Congressional authorization to an agency to "define and delimit" statutory terms does not constitute Congressional license to in effect do away with the statutory exemption altogether. Notwithstanding the Department's Opposition, that is what has occurred here.

**B.	The New Section 552.6 Is Arbitrary And Capricious**

The Department's Opposition does not contest Plaintiffs' assertion that the types of ADL services now restricted to incidental status by the new Rule are the core services that the vast majority of caregivers have been employed to provide to elderly and disabled individuals in their homes on a regular basis for the past four decades, far in excess of 20 percent of the time. Therefore, the Department cannot deny that its modified definition of companionship constitutes a drastic reversal of longstanding recognition of ADL caregiving as a core element of companionship. Under the Supreme Court's holdings in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 41 (1983); and *FCC v. Fox TV*

6

*Stations, Inc.*, 556 U.S. 502, 503 (2009), such a reversal can only be upheld if the Department meets a heightened standard of justification for changing positions.[7]

Under *State Farm*, an agency action is deemed to be arbitrary and capricious if any of the following are met: (1) the agency relied on factors which Congress has not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency offered an explanation for its decision that runs counter to the evidence; or (4) the agency's explanation is so implausible that it could not be ascribed to agency expertise. *See Association of Private Colleges v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012). Here, all of these factors support a finding of arbitrary and capricious agency action.

In the present case, the Department's reversal of policy certainly rests upon factors that Congress did not intend the Department to consider, specifically the erroneous and now discredited claim that Congress intended all along to limit the exemption to "casual" companions who did not make caregiving their "vocation." The Department's Opposition concedes that the agency adopted the new 20% restriction because "a limit was necessary to keep the definition of companionship services consistent with the [now discredited] view adopted from the legislative history of the 1974 amendments…." (Opp. at 13). On this basis alone, the Department's new Rule must be found arbitrary. *Duncan, supra*.[8]

---

[7] This is particularly so because the Department's reversal "rests upon factual findings that contradict those which underlay its prior policy;" and because the Department's prior policy has engendered serious reliance interest that must be taken into account." "In such cases, … a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox TV*, 556 U.S. at 515-16.

[8] As further discussed above, the new Rule capriciously undermines the intent of Congress to encourage deinstitutionalization of care, control costs of care, and maintain continuity of care for a longer number of hours each day. Substantial evidence in the record indicates strongly that each of the foregoing factors will be adversely impacted by the new Rule. Therefore, this Court should find that the Department has failed to justify the new Rule with substantial evidence in the record as a whole, and the new Rule must be found to be arbitrary and capricious as a result. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-6.

Even more arbitrarily, the Department's Opposition states that the selection of a 20 percent limit was based on "historical practice" with which the regulated community is "familiar."  (Opp. at 13). To the contrary, there is no "historical practice" of applying any limitation on the percentage of "care" that can be applied to home care under the FLSA exemption.  The Department is instead applying limitations that were developed for totally different purposes and/or for unrelated FLSA regulations, and arbitrarily imposing them on the home care industry.

The Department further claims that its radical narrowing of the companionship definition is justified by the growth of the home care industry that "neither Congress nor the Department predicted." (Opp. at 11).  Ignored in the Department's Opposition is that the growth of home care and reduced institutionalization was exactly what Congress intended in passing the companionship exemption, with the stated goal of keeping home care affordable for elderly and infirm consumers. At a time when the growth of the home care industry is serving the best interests of consumers at affordable rates, the Department has given no adequate justification for attempting to destroy the industry's successful caregiving model, which is what the new Rule will inevitably do.

Also contrary to the Department's Opposition, the job duties of home care service providers are the same today as they were in 1974 (and 2007). Regardless of their hours of work, home care and live-in employees continue to provide "fellowship, care, and protection" for people who are physically or mentally infirm, just as they always have. There is thus no rational connection between the asserted justification for the new Rule (growth in the home care

industry) and the Rule itself (excluding the vast majority of caregiving companions from the companionship overtime exemptions).

The overwhelming evidence in the Administrative Record establishes that Section 552.6 will result in significant adverse impacts on consumers resulting from the new Rule's unjustified exclusion of care from the core functions of companionship.  These adverse impacts include in particular the likelihood of increased institutionalization, due to the inevitable increased costs of home care as a direct result of the new Rule. Contrary to the Department's Opposition, such concerns are not mere "speculation," but are the considered judgments of employers, consumers, and state governments based upon their "real world" experiences. The evidence cited by the Opposition for its contrary view is itself highly speculative and contrary to the record.

Finally, the Department's postponement of its own enforcement of the new Rule until July 2015, while stubbornly insisting on an immediate effective date for the new Rule, confirms the arbitrary nature of the Rule itself.  The Department's October announcement of the need for delayed enforcement acknowledged that Medicaid does not currently cover overtime or non-care "fellowship." As previously explained in Plaintiffs' Notice of Supplemental Authority (Dkt. #19), the National Association of Medicaid Directors (NAMD) wrote to the Department requesting postponement of the effective date of the new Rule by an additional 18 months. The Medicaid Directors themselves stated the following with regard to problems arising from the new Rule:

> [T]he current effective date of January 1, 2015, fails to provide sufficient time for the federal agencies and state partners to understand the policy and operational issues, develop workable solutions on key components and determine an appropriate course of action if we cannot identify a feasible solution." [ ] In addition, many states are increasingly concerned that the tools and technology to comply with the rule do not exist in some areas and may require a significant

investment of resources in other areas. State legislatures will need to approve funding for any such investment in many states. More time is needed to refine the cost estimates and secure approval for such resources.

The Department's explanation of its insistence on an immediate effective date is both hollow and hypocritical. (Opp. at 40-41). While admitting that the regulated community is not ready for enforcement of the Rule, the Department now declares that employers should nevertheless be subjected to immediate private enforcement, which will be even more expensive and disruptive to the industry.[9] The Department's "passive/aggressive" enforcement policy is clear proof of the new Rule's arbitrariness and abuse of discretion.  For this reason as well, the new Rule must be vacated.

###### C.    Section 552.6 Must Also Be Vacated Because It Is Now Beyond Dispute That No Adequate RFA Impact Analysis Has Been Done To Take Into Account This Court's Order Vacating Section 552.109.

The Department's Opposition fails to offer any credible response to Plaintiffs' contention that Section 552.6 must be vacated independently of the grounds set forth above because the Department now stands in plain violation of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-611. The procedural obstacle posed by the Department is of no moment. (Opp. at 27). There is no basis for the Department's contention that the Court lacks jurisdiction to grant injunctive relief for the obvious RFA violation in this case.[10]  *See Aeronautical Repair Station Assn. v. FAA*, 494

---

[9] Significantly, the Department's October 2014 announcement of its six-month enforcement delay made no mention of the Department's intent to encourage private enforcement of the new Rule beginning January 1.  The first public announcement of the Department's previously hidden agenda occurred at the TRO hearing in this case, now confirmed in the Department's Opposition.

[10] The case cited by the Department's Opposition for this argument, *Sai v. Transportation Security Admin.*, 2014 WL 3029217, at *2 (D.D.C. July 7, 2014), is distinguishable on its facts, but also held that the plaintiff's complaint sufficiently raised the issue in question as to support plaintiff's preliminary injunction motion.  In the present case, contrary to the Opposition (Opp. at 27, n.14), Plaintiffs raised the same issue in their Complaint that is now before the Court in their motion for preliminary injunction, *i.e.*, the Department's failure to conduct an adequate cost-benefit analysis under the RFA. Plaintiffs'

F.3d 161 (D.C. Cir. 2007). In the present case, the Department's required regulatory impact analysis clearly must be redone prior to allowing Section 552.6 to go into effect under the RFA.

The Department's Opposition erroneously claims that the impact on third-party employers of Section 552.6 is "essentially the same," thereby obviating the need to conduct a new analysis.  But it cannot be denied that the current impact analysis was incorrectly premised on the notion that third-party employers would be <u>unaffected</u> by Section 552.6 (since they were excluded from the exemption by Section 552.109). 78 Fed. Reg. 60497, *et seq*.  The Department therefore plainly did not attempt to measure the paperwork burdens and other impacts of Section 552.6 on third party employers who employ more than 90% of all companionship workers. Now, for the first time in the 15 months since the new Rule was issued, third-party employers attempting to comply with it must spend hours and dollars to reschedule their workers and document their performance of care giving services as a percentage of their work weeks. For this reason alone, Section 552.6 cannot be allowed to go into effect unless and until a new regulatory impact analysis is conducted in conformance with the RFA.[11]

---

Complaint expressly alleged that the Department failed to conduct the necessary regulatory impact analysis under the RFA.  Complaint at ¶ 41 ("The Department has failed to conduct an adequate cost-benefit analysis compliant with the [RFA].")

[11]  On each of the grounds set forth above, Section 552.6 should also be held not to be severable from the vacated provision of Section 552.109 and should be struck down on that basis as well.. *See MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732 (D.C. Cir. 2001).  There is indication that the Department intended the provisions to be severed, and the provisions do function sensibly without each other.

## II.     PLAINTIFFS HAVE SATISFIED THE IRREPARABLE HARM
##         REQUIREMENT.

### A.     Contrary To The Department's Opposition, No Basis Exists To Find
###        "Inexcusable Delay."

The Department's Opposition provides no factual or legal basis for challenging Plaintiffs'

Motion on the basis of inexcusable delay in filing it.  The Department is forced to concede that

Plaintiffs initiated this action almost six months ago; that Plaintiffs and the Department agreed to

expedited briefing in order to give the Court sufficient time to review the issues in advance of the

scheduled January 1 effective date; and that Plaintiffs filed their motion to stay Section 552.6

within two days after receiving the Court's order vacating Section 552.109.  As previously

explained in Plaintiffs' earlier filings [Dkt. #20], this was the earliest opportunity for Plaintiffs to

challenge Section 552.6 with any likelihood of success.  This was so because until the Court

vacated Section 552.109, the Department would have been able to challenge the extent of

Plaintiffs' injury caused by the definitional changes in Section 552.6, to which Plaintiffs had no

access under the unlawful Section 552.109.

At the TRO hearing, the Department's counsel argues that Plaintiffs' should have filed

their motion sooner because the Department had not previously questioned Plaintiffs' standing.

As the Department is well aware, however, standing is a jurisdictional matter that can be raised

at any time. *See Associated Builders and Contractors, Inc. v. Shiu*, 13-1806 (D.D.C. Mar. 21,

2014) (in which the Department made no objection to a plaintiff's standing until the court itself

raised the issue at a hearing on cross-motions for summary judgment, at which point the

Department changed its position and made a standing challenge).  Nothing would have prevented

the Department from similarly waiting to challenge Plaintiffs' standing here, if Plaintiffs' had

12

prematurely filed a preliminary injunction motion against Section 552.6 prior to this Court's ruling vacating Section 552.109.

Switching tacks, the Department now argues for the first time in its Opposition that if Plaintiffs lacked standing to file their preliminary injunction motion, then Plaintiffs' Complaint should somehow be retroactively dismissed for lack of jurisdiction. (Opp. at 31).  No case has ever so held under remotely similar facts.[12]  The Department also ignores the different standards applicable to possessing standing to file a complaint and the higher threshold for filing a motion for preliminary injunction. In any event, Plaintiffs unquestionably have standing now to seek to enjoin the Department's new Section 552.6, because Section 552.109 has been vacated, and there is no basis for challenging Plaintiffs' standing to pursue their Complaint as to both challenged provisions.

None of the "inexcusable delay" cases relied on by the Department's Opposition support the contention that Plaintiffs' motion was untimely in the present case, because in none of those cases did the plaintiffs have a comparably good reason (or indeed any reason at all) for filing late.[13]  Finally, it is significant that the Department's Opposition fails to distinguish or address the cases cited in Plaintiffs' initial Memorandum, at 9-10, which granted injunctive relief under

---

[12] Certainly, the case relied on by the Department's Opposition, *La Botz v. Fed. Election Comm'n*, No. CV 13-997 (D.D.C. July 25, 2014), does not bear any resemblance to the present facts.  There a plaintiff in two separate lawsuits tried to claim standing in the second suit on the basis that he had standing when he filed the first complaint.  Because he had moved out of the jurisdiction his claims were no longer re-dressable when he filed the second complaint.

[13] See *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (plaintiff inexcusably delayed even filing his complaint until one month before an event he was challenging); *NRDC v. Pena*, 147 F. 3d 1012, 1026 (D.C. Cir. 1998) (no excuse given); *Fund for Animals v. Frizzell*, 530 F. 2d 982, 987 (D.C. Cir. 1975) (same); *Indep. Bankers Ass'n v. Heian*, 627 F.2d 486, 488 (D.C. Cir. 1980) (unexcused delay of 12 years).

similar circumstances notwithstanding even longer delays in those plaintiffs' filings.[14]  See also the newly decided case of *Texas Children's Hospital v. Burwell,* C.A. No. 14-2060 (EGS), 2014 U.S. Dist. LEXIS 177644 (D.D.C. Dec. 29, 2014), rejecting similar claims of unexcused delay and granting preliminary injunctive relief.

**B.     Contrary To The Department's Opposition, Plaintiffs Have Demonstrated Irreparable Harm Warranting Injunctive Relief**

Plaintiffs supported their motion with multiple affidavits from all sectors of the home care industry demonstrating irreparable harm.  These included detailed and specific testimony from an employer representative, two representatives from the disabled community that are among the principal consumers of the employers' home care services, and a state government agency familiar with both the inadequate Medicaid funds available to pay the non-recoverable costs of the new Rule as well as the harm befalling both public and private home care agencies and consumers.  Contrary to the Department's Opposition, these affidavits, combined with numerous statements in the Administrative Record and the Navigant survey incorporated by reference in Plaintiffs' Motion, provide ample proof of specific and imminent irreparable harm, some of which has already begun to occur in anticipation of the new Rule.

Out of an abundance of caution, however, in further response to the Department's unfounded Opposition, Plaintiffs are providing evidence of additional irreparable disruption of the home care industry that will take place if the new Rule is allowed to take effect, and in some cases already has occurred due to assumptions by some interested parties that the Rule would not be stopped from going into effect.  These additional affidavits include a declaration from the

---

[14] *See Pennenvironment v. PPG Industries, Inc*., 2014 WL 6982461 at *15 (W.D. Pa. 2014); *Gold v. Eng'g Contractors, Inc.*, 831 F. Supp. 2d 856, 860 (D. Md. 2011); *Amicus, Inc. v. American Cable Co., Inc*., 660 F. Supp. 161 (E.D. La. 1987).

President of a home care provider in California who reports on a recent state-wide survey demonstrating the adverse impact of recent changes in California's overtime exemption. California's changes are significantly less burdensome than the new Rule;[15] but the attached survey report shows that the overwhelming majority of home care providers surveyed have already lost significant percentages of their customers either because the customers could not afford the increased costs resulting from the partial loss of the overtime exemption, or because they found the increased number of part-time caregivers was harmful to their care needs, or for both reasons.  The survey also found reductions in overall weekly pay rates to employees at the vast majority of home care workplaces, along with many lost jobs due to customer terminations, and significant percentages of reported employee dissatisfaction.

Also attached is a declaration from the Executive Vice President of the Home Care Association of New York who is familiar with the New York State Medicaid program's lack of preparedness to incorporate the increased costs from Section 552.6.  The State's lack of preparedness in turn will create serious risk to patient access and continuity of care, as well as home care agency operations if the new Section 552.6 is allowed to take effect.  The attached affidavit flatly contradicts the assertion in the Opposition that New York is prepared to handle the fallout from the new Rule.  (Opp. at 37).

Plaintiffs cited numerous cases, which Defendant's Opposition has failed to address or distinguish, where federal courts have found similar and even less compelling evidence to meet the threshold for irreparable harm in the D.C. Circuit.  *See* Plaintiffs' initial Memorandum at 9, citing *Nalco v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (affidavits that plaintiff would lose sales and goodwill with no right of recourse against the federal government); *Alf v. Donley*, 666

---

[15] Unlike the new Rule, California continues to exempt overtime up to 48 hours per week, among other important differences.

F. Supp. 2d 60, 70-71 (D.D.C. 2009) (plaintiff's declaration as to threatened loss of business

connections); and *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25

(D.D.C. 2009).

A newly decided case, *Texas Children's Hospital v. Burwell*, C.A. No. 14-2060 (EGS),

2014 U.S. Dist. LEXIS 177644 (D.D.C. Dec. 29, 2014), strongly supports Plaintiffs' position in

favor of preliminary injunctive relief.  There two hospitals challenged a ruling by the Secretary

of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services

("CMS") that changed the method of calculating payment limits to hospitals in alleged violation

of the APA and the Medicaid Act.  The court observed that non-recoverable economic loss has

been found to be "more than sufficient, especially when considered with the other [preliminary

injunction] factors, to justify a preliminary injunction."  Of particular relevance here, the Texas

Children's Hospital court further observed: "Defendants argument that monetary loss constitutes

irreparable harm only where the loss threatens the very existence of the movant's business…

misses the point – plaintiffs may not be driven out of business, but ***programs they provide may

be***."  *Id*. at *41-42. The court specifically cited reduced services that would be curtailed due to

the loss of funds by non-profit entities.  (Plaintiffs here represent many non-profit home care

providers.).

The foregoing holdings are consistent with previous decisions by this Court, including

those previously cited in Plaintiffs initial memorandum.  *See R.J. Reynolds Tobacco Co. v.

United States Food and Drug Administration*, 823 F. Supp. 2d 36, 50 (D. D.C. 2011) (Leon, J.)

(finding irreparable harm due to plaintiffs' inability to recover costs from a federal agency).

That case in turn cited the Court's own decision in *Smoking Everywhere, Inc. v. FDA*, 680 F.

Supp. 2d 62 (D.D.C. 2010) (Leon, J.), which again found irreparable harm and specifically found

that proof of a plaintiff's going out of business entirely was not required where other types of irreparable harm are present. *See also Clarke v. Office of Federal Housing Enterprise Oversight*, 365 F. Supp. 2d 56 (D.D.C. 2004) (Leon, J.).[16]

Here, it should be noted that an entire industry is impacted by the challenged Rule, include thousands of private and public employers, millions of employees, and more millions of home care consumers. The harm incurred by each segment of the industry directly and irreparably harms the other segments. Thus, the evidence of harm to consumers is specific evidence of harm to the providers, who are threatened with imminent loss of customer good will and business that is both "certain and great." *R.J. Reynolds Tobacco Co., supra*, 823 F. Supp. 2d at 49. The failure of state Medicaid programs to step forward with funding to cover the costs of compliance with the new rule (which the Department's own impact statement declares to be in excess of $280 million), is specific evidence that such costs will be non-recoverable.

Finally, it must be noted that the harm facing home care employers is hardly "self inflicted," contrary to the unfair description in Department's Opposition. (Opp. at 35). Nor is it a matter of "choice." *Id*. Whichever way the providers turn, they will be injured by the new Rule: if the providers attempt to comply by paying overtime for current hours worked by their companionship employees, then they will lose customers who do not want to have to pay higher rates for overtime; and the providers will not be able to recover their costs for overtime that is

---

[16] Defendant's Opposition does not purport to distinguish the above cited past decisions of this Court granting injunctive relief, but chooses to rely on the Court's rulings in *Geo Specialty Chemical, Inc. v. Husisian*, 923 F. Supp. 2d 143 (D.D.C. 2013) (Leon, J.); *Brown v. District of Columbia*, 888 F. Supp. 2d 28 (D.D.C. 2012) (Leon, J.); and *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 335 (D.D.C. 2009) (Leon, J.). Those cases dealt with significantly different circumstances, however. Thus, *Geo Specialty* involved a private dispute in which a former client of a law firm sought an injunction to prevent a purely hypothetical breach of legal ethics. *Brown* dealt with a terminated law professor who speculated about her future hiring prospects without any support in the record. *Bill Barrett Corp.* involved a drilling license dispute in which the court found that the plaintiff had an adequate remedy at law in the form of a breach of contract action.

not covered by Medicaid. If the providers attempt to comply by reducing work hours, they will

nevertheless lose customers who do not want to allow additional caregivers into their homes. The

providers will also face irreparable employee dissatisfaction from workforces whose overall take

home pay will be reduced as a result of fewer work hours. Taken as a whole, there will

unquestionably be irreparable harm to an industry model that has worked for four decades to

achieve the Congressional intent of affordable home care and reduced institutionalization. For

all of these reasons, the injunction should be granted.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH OVERWHELMINGLY IN PLAINTIFFS' FAVOR

In light of the Department's October announcement that the new Rule is not ready for

governmental enforcement [Dkt. #19], as discussed above, the Department cannot credibly claim

that there is any public interest in favor of private enforcement of the new Rule under an

immediate effective date. Nevertheless, the Department does make such a claim. (Opp. at 38-42).

The Court should reject this contention out of hand. The Department's delayed enforcement of

the rule is utterly inconsistent with the agency's argument that the public will be harmed by

delaying the effective date in a similar fashion. The Department's Opposition concedes that it is

withholding governmental enforcement in order "to allow the Department to focus its resources

on providing additional assistance to states as they make adjustments to their operations,

programs, and budgets to ensure compliance…." (Opp. at 41). If the Department with all of its

resources is not yet sufficiently "focused," and if the states need six more months to "make

adjustments" to the new Rule, then no justification exists for immediately exposing home care

providers to private litigation as the Department now seeks to do.

Equally wrong is the Department's claim that the challenged Rule should be allowed to take immediate effect because "some states" have "made preparations" to arrange for funding for home care overtime services under the new Rule, and that such preparations would be "irreparably disrupted" if the new Rule does not take effect immediately. (Opp. at 41). On their face these assertions fail to justify immediate private enforcement of the new Rule. Thus, the fact that only "some states" have "made preparation" for funding means that "many" states are not yet fully "prepared" for the new Rule. At the same time, those states that are ready to comply immediately will be just as ready (and more so) if the new Rule is temporarily delayed. There is undisputed evidence in the affidavits and the Medicaid Directors' letter to the Department that "many" state agencies are completely <u>un</u>prepared to comply with the new Rule or to assist consumers or providers in obtaining funding for such compliance. See Kansas Secretary Brufett's Affidavit identifying imminent harms threatening 11,000 Medicaid participants; see also Cardillo affidavit describing continuing lack of preparedness in New York.

The Department's Opposition relies heavily on the Affidavit of its Assistant Administrator, Michael Hancock, who describes the Department's "outreach" efforts to explain the new Rule over the past 15 months. Hancock Aff. at 4-6. Unstated in the Affidavit or the Opposition is the fact that much of the Department's communications effort was wasted, and in effect confused the issue further, because Mr. Hancock and his associates inadvertently gave misinformation to their audiences about Section 552.109 of the new Rule. Specifically, the Department has spent the last 15 months telling audiences that Section 552.109 excluded third-party employers from availing themselves of the companionship exemption, information which is now obsolete as a result of the Court's order vacating that portion of the Rule. Clearly,

additional communication is required between the Department and its stakeholders to unravel the confusion caused by the Department's earlier communications, in light of recent events.

Finally, it is always in the public interest to enforce the law as Congress intended it to be enforced.  As discussed above, Congress by its plain language and legislative history intended that companionship caregivers be exempt from overtime under the FLSA.  Section 552.6, like Section 552.109, is an unlawful attempt by the Department to narrow Congress's statutory exemption.  It is contrary to the public interest to allow such a Rule to take effect.

## IV.    CONCLUSION

For each of the reasons set forth above, Plaintiffs ask that the Court issue a preliminary injunction preserving the status quo and staying the effective date of Section 552.6 of the challenged Rule, pending a final ruling on the merits of the Rule.

Respectfully submitted,

*/s/ Maurice Baskin*
Maurice Baskin (D.C. Bar No. 248898)
Littler Mendelson, P.C.
1150 17th St., N.W.
Washington, D.C. 20036
Telephone: 202.772.2526
Fax:    202.318.4048
mbaskin@littler.com

William A. Dombi
D.C. Bar No. 445832
Center for Health Care Law
228 Seventh Street, SE
Washington, D.C. 20003
Telephone: (202) 547-5262
Facsimile:  (202) 547-7126
wad@nahc.org

Attorneys for Plaintiffs